THE PEOPLE ex rel. ANDREW McMULLEN, Mayor of
Schenectady, Appellants, v. WM. S. SHEPARD, THOMAS
COLEMAN, STEVENS V. TRULL, GEORGE W. LU-
THER, and NELSON DAVENPORT, Respondents.

*Capital Police District—Constitutionality of Statute.*

The law of 1865, establishing a Capital Police District, embracing portions
of the counties of Albany and Rensselaer, is in conflict with no provision of
the State Constitution.

The Amendatory Act of 1866, extending that district so as to include
within its bounds a portion of the county of Schenectady, is also free from
constitutional objection.

In a public statute, applicable to particular localities or to known and open
highways, there is ordinarily no occasion for the minuteness and precision of
description usual in conveyances of real estate.

The validity of general laws, enacted by the constituted authorities of
the State, cannot be challenged in the courts on the theory that they may
have been adopted from motives in hostility to the public good.

APPEAL from the Supreme Court. The action was in the
nature of a quo warranto, to test the constitutionality of the
amendment to the Capital Police Act of 1865, by the Act of
1866, which provided for including the city of Schenectady
within the district, together with four miles of intermediate
territory within the lines of the New York Central Railroad.

The cause was tried at the Albany Circuit, before Mr. Justice
Hogeboom, who gave judgment for the Defendants. The judg-
ment was unanimously affirmed by the Judges of the Third Judi-
cial District, and the Plaintiffs appealed to this Court. The facts
are sufficiently stated in the opinion.

*Alonzo C. Paige* for the Appellants.

*John H. Reynolds* for the Respondents.

PORTER, J.—Most of the questions raised on the present appeal
were disposed of ten years since, in the case of The People on the
relation of Fernando Wood v. The Metropolitan Police Commis-
sioners (15 N. Y. 532). They were discussed on that occasion

with memorable ability, as well in the forensic arguments as in the opinions delivered by the Court; and the result was an exposition of the Constitution in this regard, by which every citizen is bound.

Certain propositions are deducible from that decision, which essentially narrow the range of the present discussion.

1. It is within the constitutional authority of the legislature to establish new civil divisions of the State, embracing in the districts so created several towns, cities, or counties, or such portions thereof as may be deemed appropriate for the general purposes of civil administration.

2. The organization, for police purposes, of districts not coterminous with others recognized by the Constitution, is not incon, sistent with the continuance of such antecedent civil divisions, for every general purpose prescribed in the organic law.

3. The police powers exercised in the towns, cities, and counties, respectively, were vested in the local authorities by legislation, and not by irrevocable constitutional grant.

4. The legislature has authority to arrange the distribution of these powers as the public exigencies may require, apportioning them to local jurisdictions to such extent as the law-making power deems appropriate, and committing the exercise of the residue to officers appointed as it may see fit to ordain.

5. This is a continuing legislative power, in virtue of which, from time to time as occasion may require, jurisdiction committed to the towns, cities, or counties, may be resumed and vested in other authorities appointed by the State government.

6. " The State," in the language of the distinguished jurist by whom in that case the leading opinion was delivered, " has an interest in the repression of disorder, and the maintenance of peace and security in every locality within its limits; and if, from exceptional causes, the public good requires that legislation, either permanent or temporary, be directed toward any particular locality, whether consisting of one county or several counties, it is within the discretion of the legislature to apply such legislation as in its judgment the exigency of the case may require;

and it is the sole judge of the existence of such causes" (15 N. Y. 544; 32 id. 377).

The Capital Police Act now under consideration was adopted by the legislature in the exercise of this constitutional authority. In the form in which it was originally enacted, its validity is too clear for serious discussion. The substantial issue is as to the constitutionality of the act as amended in 1866. In considering this question, the amendments should be treated as incorporated in the body of the original law (Sess. Laws, 1865, ch. 554; id. 1866, ch. 483).

The Act of 1865 included in the district to which its general provisions are applicable certain portions of the counties of Albany and Rensselaer, consisting of contiguous territory, and embracing within its bounds the cities of Albany and Troy, and various towns and villages, including Greenbush, West Troy, Green Island, Cohoes, and Lansingburg. The amendment of 1866 extended the district by the addition, in the county of Schenectady, of "all that territory covered by and included within the lines of the property of the New York Central Railroad, between the cities of Albany and Schenectady, and the city of Schenectady." The entire area within the limits designated by the two acts is declared to be "constituted and territorially united, for the purpose of police government and discipline therein," into one district, which shall be known as the Capital Police District of the State of New York.

It is claimed that the district thus created does not consist of contiguous territory, and that this constitutes a fatal objection to the validity of the act. It is unnecessary to determine whether this proposition, if well founded in fact, would be tenable in law. Certainly there is no such specific limitation in the Constitution of the powers to be exercised by the legislature in the organization of districts for police purposes; and "we are unable to see," as this Court said in the Metropolitan Police case, "that any arrangement of the machinery of the government which the Constitution has provided, would be impeded or disturbed" by an act incorporating two neighboring cities in such a district

without embracing an intervening town. Deviations from the
ordinary system of police regulation ought not to be made,
except when demanded by public considerations; and it would
be the part of wise legislation to limit them, as far as practicable,
by the extent of the particular evils they are designed to abate.
But in the present instance the district created by the act consists
only of contiguous territory. Its exterior bounds are fixed and
definite. All within these bounds is embraced; all without is
excluded. The territory thus embraced is none the less contigu-
ous, whether its width be thirty yards or thirty miles. The
power of the legislature, if it were subject to the supposed lim-
itation, must be determined with reference to the simple fact of
actual contiguity (Holmes v. Carley, 31 N. Y. 289).

It is claimed that, in including the New York Central roadway
within the limits of the district, the Senate and Assembly acted in
bad faith, and with the evasive and fraudulent purpose of making
the entire territorial area contiguous, in accordance with the sup-
posed requirements of the Constitution. It is not easy to per-
ceive how the validity of a law can be questioned on the ground
that the legislature complied with the provisions of the Constitu-
tion only because they were forbidden to do otherwise. If it
were decorous for us to institute an inquiry into the motives of
official action by a co-ordinate branch of the government, there
is not a scintilla of evidence to justify us in imputing to the legis-
lature any purpose of fraud or evasion. It is impossible to read
the provisions of the act without being impressed with the im-
portance of the ends it seeks to attain, and the efficiency of the
agencies it organizes for the preservation of order, the protection
of person and property, the detection and arrest of culprits, and
the punishment and prevention of crime.

The district comprises the State capital, with the neighboring
cities and villages, and the depots of general commerce at one
of the great central points where the avenues of travel and traffic
converge. It includes the termini of the various routes of river,
canal, and railway transportation which centre in the vicinity of
the capital, and it embraces a limited area which offers peculiar

temptations to rogues, and unusual facilities for confederacy, concealment, and flight. It is true that there are no habitations on the four miles of roadway between Schenectady and Watervliet; but there was obvious propriety in the provision embracing it within the bounds of the district. In framing a law for the purpose of extending special protection to the persons and property of citizens, strangers, and travellers, in a locality of peculiar exposure, the legislature were not bound to ignore the fact, officially communicated to them in the report of the State engineer and surveyor, that over the thoroughfare whose eastern terminus it was proposed to protect there is an annual transportation of between three and four millions of passengers, and of property to the amount of a million and a half of tons (Assembly Documents, 1865, No. 176, pp. 48, 50). They did not need to be admonished, by the then recent case of Gordon, that this was a convenient avenue of escape for the incendiary, the thief, and the burglar, as well as the midnight murderer. They could not be unmindful of the importance of police surveillance on a portion of the route especially infested by those who pursue their work of pillaging travellers by night and by day ; nor could they be insensible of the advantage of a police force properly distributed, subject to common control, and aided by facilities for rapid communication from city to city, by telegraphic and railroad lines. So much of the intermediate territory between Watervliet and Schenectady as the legislature deemed necessary for these purposes, was accordingly included within the police district; and it constitutes no objection to the validity of the law, that it was not thought needful to include the residue of Rotterdam, an orderly and rural town, which offered no temptation to rogues and criminals, and needed no special police for the protection of its sparse population.

It is proper, however, to add, that we do not recognize the right of the relator to assail the validity of the act on the theory that it was adopted from motives in hostility to the public good, or to the general policy of the State. In the language of Judge Denio, "the courts cannot impute to the legislature any other

than public motives for their acts. If a given act of legislation is not forbidden by express words, or by necessary implication, the Judges cannot listen to a suggestion that the professed motives for passing it are not the real ones. If the act can be upheld upon any views of necessity or public expediency, which the legislature may have entertained, the law cannot be challenged in the courts" (15 N. Y. 545). It follows from these views, that on the principal questions, so ably discussed by the learned counsel for the Appellants, we concur in the judgment of the Court below.

We think there is no force in the suggestion that the law is invalid for uncertainty, in the description of that portion of the territory included within the lines of the New York Central Railroad. There is no occasion, in a statute of this nature, for the minuteness of description usual in conveyances of real estate. The area embraced in the district is defined with sufficient certainty for all the purposes of the act. The Central Railroad, between the cities of Albany and Schenectady, is a known and open highway of commerce, of which the course and limits are marked with more precision and permanence than ordinarily define the bounds of private possession; and, when it is the subject of legislation, there is no more occasion for a special designation of its metes and bounds, than if the subject of the statute were the Delaware and Hudson Canal, the New York Central Park, or the Suspension Bridge at Niagara.

The Judge properly overruled the objection taken on the trial, that the notice of the organization of the board of police, required by the 55th section of the act, was not served on the relator until after the commencement of this suit. The service of the notice was not to precede, but to follow, the Defendants' organization as a police board for the district, as enlarged by the law of 1866. It was not a condition precedent to the assumption of office by the Defendants, but a duty imposed in virtue of such office. The purpose of the notice was to advise the old police of the termination of their authority, and no time was prescribed for its service. It was in fact served, before this action

was brought, on all the members of the old police force of the city of Schenectady, except the mayor and one of the deputy sheriffs; and the only effect of the delay as to them was, not to divest the Defendants of their offices, but to leave the relator and the deputy for the time being in the discharge of their duties under the old law. It is unnecessary to determine the question, whether their official authority as police officers was terminated by actual notice, in another form, of the organization of the new board, as that is an immaterial issue which does not concern the Defendants. The action was brought under the first subdivision of the four hundred and thirty-second section of the Code; and the gravamen of the issue is, as to their title to the offices they assume to hold. It does not appear from the finding of facts, that the omission to serve the notices at an earlier day was imputable to negligence; but even if there had been a culpable and unreasonable delay, it would have been unavailing, in this action, to the relator. The remedy, if any, would be by proceeding under the second subdivision of the section, and alleging that the Defendants were in office, and that they had forfeited it by breach of official duty.

All the Judges concurring, except Grover, J., who was for reversal,

Judgment affirmed.

JOEL TIFFANY,
State Reporter.