## The People on the relation of The Board of Park Commissioners v. The Mayor of Detroit.

*Constitutional law : Detroit park acts : Local self-government : Park commissioners : Common council : Citizens' meeting.* All the provisions of the amendatory park act (*Sess. L. 1873, Vol. 2, p. 100*) having the intent and purpose, or auxiliary to or calculated for carrying into effect the main intent and purpose of the act, to place in the hands of the park commissioners the entire and independent power of locating the park, contracting for the lands, and creating the debt, etc., without the necessity of consulting either the common council, a citizens' meeting, or any body else, are held to be, within the principles of *Board of Park Commissioners v. Common Council of Detroit, 28 Mich., 228,* unconstitutional and void; and the act is to be treated and construed as if such provisions had never been inserted; and so construed, it does not repeal or affect the provisions of the original act (*Sess. L. 1871, Vol. 2, p. 1322*) requiring the approval of both the common council and a citizens' meeting before the debt could be incurred or the bonds issued.

*Statute construed : Citizens' meetings : Board of estimates.* Under the act of 1873 (*Sess. L. 1873, Vol. 2, p. 265*) abolishing citizens' meetings and substituting in their place a board of estimates, it is essential that the question of the pur-

THE PARK COMMISSIONERS v. THE MAYOR.

chase of lands for a park and of the issue of the park bonds under the legisla-
tion relating to the Detroit park, should be submitted to, and receive the ap-
proval of, the board of estimates, as well as the common council.

*Park bonds: Common council: Mayor: Board of estimates.* And where the
common council have authorized the issue of such bonds without the submis-
sion of the question to the board of estimates, the mayor is justified in declin-
ing to execute the same for the reason that their issue is not *lawfully* author-
ized.

*Detroit park bonds: Board of estimates: Common council.* Whether or not
under the legislation as it now stands the question of the creation of the debt
or the issuing of the bonds could now be submitted to the board of estimates;
and whether or not their approval, together with that of the council, would
authorize the issue of the bonds:—*Quære?*

Heard May 5.    Decided May 12.

Application for *mandamus.*

*D. C. Holbrook,* city counselor, and *Theodore Romeyn,* for
relators.

*F. A. Baker, William P. Wells* and *Ashley Pond,* for
respondent.

CHRISTIANCY, J.

This is an application for a *mandamus* to compel the
respondent to execute and deliver to the controller of the
city two hundred thousand dollars of park fund bonds,
ordered by the common council to be issued, for the pur-
chase of lands for a public park, which have been selected
and contracted for by the park commissioners, and the selec-
tion, and, as is claimed, the contracts and terms of purchase,
approved by the common council.

The case, as now presented, is supplementary to that of
*The People on the relation of The Park Commissioners v.
The Common Council of the city of Detroit, 28 Mich., 228,*
to which, for the nature and history of the legislation and
the action of the commissioners, the council and the citizens'
meeting, necessary to an understanding of the facts up to
the time when the petition in that case was presented,
reference is here made to avoid repetition.

The material facts which have since occurred, and upon

which the present application is based, so far as material, are as follows: On the 5th December, 1873, the commissioners made their report to the common council, setting forth a brief history of the nature and result of their application for a *mandamus* to compel the council to issue the three hundred thousand dollars of bonds, provided for by the act of March 14, 1873; that the site selected by them was in their judgment the best that could be selected for a public park; that the terms they had succeeded in making for the purchase of the lands were at a favorable rate, and at prices below the then present market value; that by the terms of the contracts made they would expire January 1, 1874; that the place selected is the best attainable, and that the time for its purchase, if the city is ever to have one, is now, before the premises shall be covered by extensive and valuable improvements, and the advance of prices shall place it beyond their reach; that the responsibility no longer rests with the commissioners, who have in good faith endeavored to discharge their duties under the act; that by the decision of the supreme court, their action is not binding upon the city, unless sanctioned and approved by the common council; that the responsibility rests with the council, to settle and determine the question, as they shall deem for the best interests of the city.

On the 12th December, 1873, the common council passed a resolution, reciting by way of preamble what the commissioners had done and the previous history of the case, the decision of the supreme court (in the case above referred to), the good faith of the commissioners, that the council were satisfied the location selected by the commissioners was the best attainable place, and that the contracts for the purchase of the lands were at a favorable rate; and the belief of the council that it would be for the best interests of the city to provide means to complete the purchase of *a portion* of the lands selected by the commissioners; therefore the council approves of the site selected by the commissioners and reported to the council on the 13th of the

29 MICH.—44.

previous August; and for the purpose of providing means and paying for such portion of the lands selected as the park commissioners shall be able to purchase for two hundred thousand dollars, to be selected by them as they shall deem for the best interests of the city, that the controller of said city is hereby authorized and directed to prepare said bonds of the city of Detroit for execution, to the amount of two hundred thousand dollars, to be denominated Detroit park fund bonds (describing the sums in which they should be issued and time when payable), with interest at the rate of seven per cent. per annum, payable semi-annually, which bonds shall be executed in the same manner as other city bonds; and further providing for the negotiation, &c. This resolution was passed by the council by a vote of twelve to six.

On the 26th December, 1873, the board of park commissioners reported to the common council that since the passage of the resolution last mentioned, to which they refer, they have selected for a park, so much of the original site as lies west of Crane avenue, extending from Jefferson avenue to the river, which portion so selected they then proceed to describe more particularly, containing three hundred forty-seven and sixty-nine one-hundredths acres; that of this amount they have contracted for two hundred ninety-six and fifty-two one-hundredths acres, at a cost to the city of one hundred and fifty-one thousand three hundred and eighty-eight dollars and eleven cents, and they estimate the whole of the premises can be purchased and acquired, with some voluntary contributions of citizens, for two hundred thousand dollars.

This report was, on the 30th December, 1873, accepted by the council, and the recommendations therein contained concurred in by a vote of fourteen to six. The contracts referred to are in force, and the holders of them requiring payment.

On the 6th January, 1874, the council passed a resolution that the two hundred thousand dollars of bonds be

issued by the city as provided in their previous resolution of the 16th December, for the purpose of purchasing the three hundred forty-seven and sixty-nine one-hundredths acres, being the portion selected by the commissioners from the original site first reported by them, describing such portion as in the report of the commissioners last referred to; and directing the mayor and the controller forthwith to execute said bonds. This resolution was vetoed by the mayor; but on the 9th January, 1874, it was passed by the council over his objections, by a vote of fourteen to six.

The controller prepared the bonds as directed by the resolutions, and is ready and willing to execute them, and has delivered a portion of them so, prepared to the mayor, who, by the charter, is required to sign all municipal bonds, but he refuses to execute them; and to compel him to execute these bonds, the council make this application for a *mandamus.*

The respondent admits substantially all the material allegations of fact set up in the petition, including the resolutions for the issue of the bonds, and that the same have been prepared and ready for his signature, and his refusal to sign them, as alleged; admits that the board of park commissioners was lawfully constituted under the original act of April 15th, 1871, and that the members were duly qualified under said act; but he denies that it was constituted or appointed, or that it in any way exists, under and by virtue of the amendatory act of March 14, 1873. He denies that the resolutions of the council, authorizing the issue of said bonds, represent, either in law or in fact, the corporate will of the city; and insists that if such bonds can be issued at all under the present legislation on the subject, they can only be issued by the consent and approval of the board of estimates of said city, which has not been obtained.

In the case of *The People on the relation of these Commissioners v. The Common Council,* we held that it was not within the constitutional power of the legislature to com-

pel the municipality of the city, or which is the same thing, the people of the city, to contract debts against their will, or to compel the common council to issue bonds for the payment of an indebtedness contracted for the purpose of purchasing a site for a public park; that under the principles settled by this court in *People v. Hurlbut,* these park commissioners could be recognized as officers of the city, representing its collective will or its interests, not by virtue of their original appointment by the legislature, but only by reason of the assent, approval and adoption by the citizens, through the common council, who, for this purpose, were regarded as the representatives of the citizens, in appointing the members of the board, and filling vacancies in their number; that as this assent and approval were given only to the existence of a board with such powers and duties as specified in the original act of 1871 (*Laws of 1871, p. 1322*), which gave to this board only advisory and merely administrative powers, with no authority to contract for the lands for a park, or to create a debt for that purpose, except as approved and authorized, both by the common council and the vote of a citizens' meeting; and the very purpose of the subsequent act of 1873 (*Sess. Laws of 1873, Vol. 2, pp. 100 to 103*), being to give them unrestricted powers in these respects, thus taking from both the common council and the people in a citizens' meeting all power to exercise any control over their acts or any voice upon the question of creating a debt which the citizens were to be required to pay, and thus making them the masters instead of the servants of the common council and of the people, as they had been under the original act, when they could only bind the city by the assent or approval of the citizens through the council and a citizens' meeting; that therefore the assent to the creation of this board under the first act was no assent or approval of a board with the powers undertaken to be given by the subsequent act of 1873; and that this latter act, so far as its purpose was to give these additional powers, was therefore unconstitutional and void, as a

violation of those rights of local self-government which it was the purpose of the constitution to secure.

Of the correctness of these principles and their result, as stated in the opinion of the majority of this court, as given by my brother Cooley, I see no reason to doubt. [Though, had the constitutional authority of the legislature to vest in other municipal boards duly elected by the people or appointed by the council, portions of the legislative powers formerly vested in the common council, been placed upon the same narrow grounds as indicated in the opinions of my brethren in *Attorney General v. The Common Council, Supra p. 108,* I might not have been able to concur.]

It is insisted, however, on the part of the relators, that though this amendatory act of 1873 is to be held void to the extent above indicated, it is void to that extent only, and that all its provisions not coming within the reasons of the objections upon which it was held void, must still be regarded and enforced as law; that, being held void only for the reason and upon the ground that it undertook to vest in the commissioners the absolute power of contracting a debt which should bind the city, without the consent or approval of the council or a citizens' meeting, and to impose upon the council the duty of providing for its payment, by the issue of bonds, etc., and the legislature having, by an act of March 28, 1873 (*Sess. Laws, Vol. 2, p. 265, etc.,* after the amendatory park act above referred to), abolished the citizens' meeting, and thereby dispensed with the submission of the question to them for approval, leaving only the approval of the council necessary, as a pre-requisite to the creation of the debt or the issuing of the bonds; and the council having given this approval and passed a resolution for the issuing of the bonds, and requiring the mayor to execute them, all objections to the constitutional validity of the law are removed, and the action of the commissioners and of the common council are valid under the principles of our former decision.

But without stopping here to notice the abstract objec-

tion which might be made to this argument, viz: that if
the legislature could, by thus dispensing with the necessity
of the approval of a citizens' meeting, still leaving the ap-
proval of the council necessary, render valid the provisions
of the amendatory act of 1873, they might upon the same
ground have rendered it equally valid by dispensing with
the approval of the council, leaving that of the citizens'
meeting necessary.    Let us examine the act of March 28,
1873, abolishing citizens' meetings.    The first section, among
other things, provides " that all citizens' meetings, so called
for the purpose of voting taxes, or upon any other matter
authorized or required by the charter of the city of Detroit,
or any other law relating to said city, to be submitted to
such meeting, are hereby abolished." If the act had stopped
here, there might have been some plausible ground for the
argument here urged as to the consequences of the aboli-
tion ; but the act immediately proceeds with this language :
" In lieu of such citizens' meetings a board of *estimates is*
hereby created, which shall be constituted as follows: two
members from each ward shall be elected, at the same time
and for the same term as aldermen ; and five members,
who shall be elected by a general ticket at the same time
as the mayor ;" then follows further provisions for carrying
into effect this election.    All the members are to be free-
holders, and the president and chairman of the committee
on ways and means of the common council, the city con-
troller, city counsellor, presidents of the board of education,
of water commissioners, of police commissioners, of park
commissioners, of the fire commissioners, and the senior
members of the board of inspection of the house of correc-
tion, and the board of sewer commissioners, are made *ex officio*
members, with the right to participate in the deliberations
of the board, but not to vote.—*Sec. 2.*

Section 3 of the act is in the following words :

" SEC. 3. Before any moneys shall be raised or taxes levied
and collected for the purposes of the several funds men-
tioned in the charter of the city of Detroit and acts amend

atory thereof, excepting interest and sinking funds, or for the purposes for which moneys are required to be raised by other acts relating to said city which require estimates for taxes to be submitted to a citizens' meeting, the estimates of the amount of moneys required for such funds or purposes by tax shall be submitted to said board of estimates; and before any bonds shall be issued, issue of which is now required to be submitted to a citizens' meeting by said charter or any other of said acts, said issue shall be authorized by said board of estimates. The estimates for the general city taxes, which are now required to be submitted to a citizens' meeting, shall be acted upon by the common council as provided by law, and shall be submitted to said board of estimates in time to be considered by the board on or prior to said fifteenth day of May. Said board shall carefully consider all estimates hereby required by this act to be submitted to it of moneys to be raised as aforesaid, and shall approve or disapprove of the same. It may decrease the amount to be raised, but shall not increase the same. It may authorize the issuing of bonds in the same manner and in the same cases as such citizens' meetings might authorize the same. A majority of all the members elect of said board shall be required to approve of any such estimates for the raising of taxes or any part thereof, or to authorize the issue of any bonds."

It will thus be seen that every question before required to be submitted for approval or disapproval to a citizens' meeting, is required to be submitted for approval or disapproval to this board, elected by the people and representing the people, in lieu of a citizens' meeting, which, owing to the increase of population, had lost its adaptation and efficiency as a means for the expression of the popular will; and the effect of this legislation upon all acts previously requiring submission to a citizens' meeting, is to strike out the words "citizens' meeting," and to insert "board of estimates." If, therefore, prior to, and without this act, it would have been necessary to obtain the approval of the citizens'

meeting for contracting a debt or the issuing of bonds, it is now equally necessary to obtain the approval of the board of estimates, before the debt can be contracted or the bonds issued.

It is insisted, however, by the relators' counsel, that as the amendatory park act of 1873 was passed prior to the act abolishing the citizens' meeting, and had already, before the latter act was passed, expressly taken from such meeting the power of acting upon the question of contracting this debt or issuing these bonds, the latter act, which is admitted to be valid, cannot be construed as embracing, among the subjects required to be submitted to the board of estimates, the creation of this debt, or the issuing of these bonds ; because nothing was required to be submitted to the approval of this board, except what was at the time of the passage of the latter act required to be submitted to such meeting.

This argument necessarily assumes the validity of the the amendatory park act, so far as it undertook to deprive the citizens' meeting of the right of acting upon this subject, and authorized the creation of the debt and the issuing of the bonds without the approval of such meeting, and it is insisted that the act is thus far valid, and to this extent repeals the original park act, which required the submission to the meeting as well as to the council ; though void, so far as it assumed to take from the council the power of approval, and to impose upon them the duty of issuing the bonds without such approval.

But we see no plausible or possible ground upon which this view can be sustained.    In holding as we did, in the case of *The People on the relation of these commissioners v. The Common Council,* that the act was void in taking from the council the right which they possessed under the original park act of 1871, to approve or disapprove the creation of the debt, to issue or refuse to issue the bonds, and in vesting the entire right of decision in the board of commissioners alone, we, in effect, necessarily decided that

the act was void also in taking from the citizens' meeting; or—which we have above endeavored to show is the same thing—from the board of estimates, which simply occupies the place, and succeeds to the powers of such meeting, and vesting the entire power and right of decision in the commissioners, without the approval of the meeting, or of their successors, the board of estimates; since by the original park act of 1871, the right to contract the debt and to issue the bonds was made conditional upon the ratification of the contract by both the council and the citizens' meeting, and the approval of the bonds by the latter; and there can be no ground for holding that the legislature intended to distinguish between them in this respect.

There is no room, therefore, for the application to this case in respect to this or any other question arising in it, of the familiar doctrine that a part of a legislative act may be unconstitutional and void, and a part constitutional and valid. It is true the amendatory act contains some new provisions, which may, perhaps, be considered independent of and unconnected with the main purpose of rendering the powers and acts of the commissioners independent, both of the council and the citizens' meeting, and having no relation to this main purpose; such as increasing from two hundred thousand dollars fixed by the original act as the limit of the cost of the lands, to three hundred thousand dollars in the fourth section of the amendatory act, and the provisions at the close of the same section permitting the commissioners to use moneys donated for *improving* the park, as well as for the purchase of lands, while they could only be used for the latter purpose by the original act; also the provision in the seventh section of the amendatory act, restricting the power of the commissioners to expend money in embellishing the lands, until brought within the city limits; and, perhaps, the power given in the tenth section to the commissioners to contract with the board of water commissioners to sell or lease part of the lands for a reser-

29 MICH.—45.

voir or other hydraulic purposes, on such terms and conditions as shall be approved by the council. But these provisions, if independent of what I have denominated the main purpose of the act, and therefore valid, have no bearing upon any question involved in the present case, and in no way tend to remove the objections urged by the respondent, to the power of the council to authorize or require the issue of these bonds, without the approval of the board of estimates.

Now, the clear intent and purpose of all the other provisions of the amendatory act are one and inseparable, viz: to place in the hands of these commissioners the entire and independent power of locating the park, contracting for the lands, creating the debt incurred in their acquisition, and of imposing upon the municipality the duty to pay, without the necessity of consulting either the common council, a citizens' meeting, the board of estimates, or any body else. And all these provisions having this intent and purpose, or auxiliary to or calculated for carrying into effect this intent and purpose, are, within the principles of our former decision, unconstitutional and void, and the amendatory act is to be treated and construed as if these provisions had never been inserted. They do not, therefore, repeal or affect the provisions of the original act of 1871, requiring the approval both of the common council and the citizens' meeting,— now the board of estimates,—before the debt can be incurred or the bonds issued. And there being no other law under which the power exists of creating the debt or issuing the bonds, without the approval of the board of estimates, who have succeeded to the power of the citizens' meeting, the result is, that, in our opinion, the respondent, as mayor of the city, was right in refusing to sign or execute the bonds; and the mandamus prayed for must be denied.

Whether, under the present legislation upon this subject, the question of the creation of the debt or the issuing of the bonds could now be submitted to the board of esti-

mates, and whether their approval, together with that of the council, would authorize the issue of the bonds, not having been argued in this case by the counsel, we express no opinion upon it.

The other Justices concurred.