CITY OF NEWPORT *et al. vs.* JEREMIAH W. HORTON *et al.*

NEWPORT—AUGUST 2, 1900.

PRESENT: Stiness, C. J., Tillinghast, Wilbur, Dubois, and Blodgett, JJ.

(1) *Constitutional Law. Police Power. Local Self-Government. Police Commissioners.*

Pub. Laws R. I. cap. 804, passed May 31, 1900, entitled "An act to establish a board of police commissioners for the city of Newport," authorized the governor to appoint three qualified electors of the city of Newport as a board of police commissioners for said city and vested the control of the police of said city in said board, with power to appoint, control, and remove. The act, in other sections, conferred upon the board the powers and duties of license commissioners; gave them power to license such pursuits and occupations as are within the general police power of the State; gave them power to enact ordinances for the managing and directing of the police of said city; gave them power to impose penalties for the violation thereof; conferred power to summon witnesses and compel their attendance, &c., &c.

Upon a bill brought to test the constitutionality of said act in so far as the power to appoint a chief of police by said board in the place of the occupant of such office theretofore elected by the city council was concerned:—

*Held,* that the question upon the record being that of title to the office of chief of police, the court would not consider any question of constitutionality, except so far as it affected such power of appointment.

*Held,* further, that the portion of the act brought in question in the proceedings was clearly severable from the remainder; hence any assumed want of constitutionality in the latter would not affect the former.

*Held,* further, that police officers are appointed to perform a public service, and in appointing them a city merely exercises one of the functions of government, acting for the State.

*Held,* further, that the act was not unconstitutional so far as brought in question by the bill, the right of a city to the sole control of its police force not

having been so reserved as to bring it within article I, section 23, or article IV, section 10, of the constitution.

Sketch of the early history of the first four towns; their local government, and the powers conferred upon the General Assembly.

BILL IN EQUITY and PETITION IN EQUITY, the latter under the powers and jurisdiction of Gen. Laws R. I. cap. 263.

The complainants were the city of Newport and Pardon S. Kaull, who had been in January, 1900, elected by the city council of the city of Newport chief of police of said city.

The respondents were the members of the board of police commissioners appointed by the governor, in accordance with Pub. Laws R. I. cap. 804, passed May 31, 1900.

The bill and petition set forth that the complainant Kaull had been elected chief of police of the city of Newport in January, 1900, and was entitled to hold said office for the term of one year, unless removed by the mayor of said city; that May 31, 1900, the General Assembly passed chapter 804, Pub. Laws R. I., without notice to or the knowledge of said city or its city government; that under the provisions of said act the governor appointed the respondents as members of the board of police commissioners for the city of Newport, who qualified and proceeded to execute the powers set forth in said act; that acting under the powers of said act the respondents elected one Benjamin H. Richards chief of police of the city of Newport; that the latter qualified and proceeded to execute the powers of chief of police, and excluded the complainant Kaull from said office.

The bill charged that chapter 804 was unconstitutional because it infringed the right of local self-government in this State, and more especially article I, sections 13 and 23; article III; article IV, section 10; and article X, section 2, of the constitution of Rhode Island, and article XIV, section 1, of the amendments to the constitution of the United States. That the unconstitutional provisions so permeated the act as to infect the whole thereof.

The bill prayed (1) that the said act might be declared unconstitutional; (2) that all appointments made under said

act might be adjudged invalid ; (3) that the respondent board of police commissioners might be enjoined from exercising any rights under said act; (4) that the respondent Richards might be enjoined from exercising any rights under said act and appointment, and ousted from the office of chief of police ; (5) that the complainant Kaull might be adjudged entitled to the office of chief of police.

In view of the opinion of the court, it is not necessary to refer to the act as a whole ; the sections considered by the court are : Section 1—authorizes the governor with the advice and consent of the senate to appoint three qualified electors of the city of Newport as a board of police commissioners ; Section 2—authorizes said board to appoint, remove, organize, and control the chief of police and the police of said city ; to make all needful rules and regulations for their efficiency ; vests all the powers then in the mayor, board of aldermen, and city council, relative to police, in said board.

All other facts appear in the opinion.      Heard on demurrer to bill, and demurrer sustained.

STINESS, C. J.   In May last the General Assembly passed an act to establish a board of police commissioners for the city of Newport (Pub. Laws, cap. 804).   It provided for the appointment by the governor, with the advice and consent of the senate, of three commissioners, who should be qualified electors of Newport, with terms of office of two, four, and six years.   This board has authority to appoint, remove, organize, and control the chief of police and the police force generally ; to make rules and regulations therefor ; to have full charge of liquor licenses and the licensing of pawn brokers, billiard and pool rooms, hawkers and peddlers, shows, and a large list of other matters which require more or less police supervision.   The board is authorized to expend a sum not exceeding thirty-six thousand dollars, and such further sum as the city council of Newport may appropriate, for said purposes, to be paid by the city.   Power is also given to the board to make ordinances for the management of the police,

with power to impose penalties of fine and imprisonment, to summon witnesses, to punish for contempt, and to do many things which need not now be specified.

The board was duly appointed by the governor and organized under this act, and it appointed Benjamin H. Richards as chief of police in place of Pardon S. Kaull who had been elected to that office for the term of one year, by the city council of Newport, in January last.    Said Kaull claims the office, under said election; and under Gen. Laws, cap. 263, this petition is filed, in the nature of *quo warranto*, to determine the title to the office.

The ground upon which the petition rests is that the act appointing the commission is unconstitutional.

Several grounds of unconstitutionality are urged, such as the power to punish for contempt, to compel the production of books and papers, the exercise of legislative powers, etc., which need not be considered at this time.    The single question presented in this petition is whether the General Assembly has power to create a police commission, to be appointed by the governor, which can appoint a chief of police.    If it has such power, it is quite immaterial to this question what its power may be in regard to other matters which are clearly separable and distinct from that.    A statute may be void in one part and valid in other parts, unless the parts are so intimately connected that one cannot stand without the other. In *Penniman's case*, 103 U. S. 714, which went up from this court, the first section of the, act, alleged to be unconstitutional, provided that no person should thereafter be imprisoned or be continued in prison, nor his property be attached, upon an execution issued on a judgment against a corporation of which such person was a stockholder.    This was contrary to the law existing at the time when the creditor obtained a judgment against the corporation in which Penniman was a stockholder, and the objection was that it was invalid because it impaired the obligation of a contract.    The case, however, only involved the release of Penniman from imprisonment.    The court, therefore, said : " It is only neces-

sary to consider that part of section 1 of the act which relieves a party from imprisonment upon the execution. Penniman invoked that provision and no other. He was merely relieved from imprisonment, and it is that, and that only, of which Tweedle complains." The court then quoted from *Packet Co.* v. *Keokuk*, 95 U. S. 80, in which the court said : "Statutes that are constitutional in part only will be upheld so far as they are not in conflict with the constitution, provided the allowed and prohibited parts are severable. It may be conceded that the ordinance is too broad, and that some of its provisions are unwarranted. When these provisions are attempted to be enforced, a different question may be presented."

In *State* v. *Snow*, 3 R. I. 64, where a part of the act in question, which related to another offence than that charged against the defendant, was claimed to be invalid, Judge Brayton said that it was a very wholesome rule that no one can take advantage of the unconstitutionality of an act who has no interest in and is not affected by it. This language related to provisions of the act which did not affect the party who objected to them in the case before the court.

The rule as stated, Cooley's Cons. Lim. (6th ed.) 214, is that a law will not be held invalid on the objection of a party whose interests are not affected by it in a manner which the constitution forbids. See also *State* v. *Amery*, 12 R. I. 64 ; 6 Am. & Eng. Ency. Law (2d ed.), 1088, note 3.

The question in this case being that of title to the office of chief of police of Newport, it is quite immaterial to the decision of that question whether the police commission can lawfully exercise other powers which are conferred upon it by the act and which are in no way involved in the case presented. Such powers are clearly severable from that of a police appointment.

We are not called upon to consider, nor can we properly do so, any question of unconstitutionality in the act before us, except so far as it affects the power of appointment of a chief of police and the control of the police department. If the

commission had the power to appoint a chief of police, that settles this case, and it is of no consequence what their powers may be in other respects.   Of course, we understand that the argument on this line was pressed by the petitioners in order to show that unconstitutionality permeated the whole act; but we cannot give effect to such an argument, because it is very clear that the parts are not inseparable and, hence, that our decision can only rest upon the parts that affect this case.

Confining our attention, then, to the provisions of the constitution which affect the power of the General Assembly to control the police of towns and cities, the petitioners claim that the act in question infringes the rights of local self-government, fundamental and historic, in the State of Rhode Island, enjoyed and preserved from the settlement of its first four towns to the adoption of its constitution, which the constitution recognizes and on which it is built; and that this right is one of the reserved rights retained by the people under article I, section 23, and article IV, section 10, of our constitution.   The question has been ably and elaborately argued on this line.   The major premise is that four independent towns, governing themselves in all respects, formed the colony, in doing which they gave up none of their rights of self-government, that they never have given them up, and hence such rights are retained by the people.

We readily concede that the settlements in Providence, Portsmouth, and Newport were unique.   Unlike other colonies, they were made before and without a charter of any kind.   The settlers came upon land to which the crown of England had no title; they bought it of the Indians; they organized their governments.   In Providence the organization was called a town; in Portsmouth, a "Bodie Politick;" in Newport, a "Plantation."   Whatever the name they chose, they were in fact independent sovereignties.   They had no superior and no subordinate.   The inhabitants of Warwick did not recognize the authority of these self-constituted governments, and did not organize at all until after the first charter had been obtained from the English parlia-

ment in 1643–4, and the colony had been organized under it in 1647. The form of government adopted under that charter was a federation of towns rather than a colony. Legislation originated in the towns, and the General Assembly had simply a power of approval or veto. Local self-government was preserved to its full extent. The reason for this was stated in a charter granted to Providence in March, 1648 (1 R. I. Col. Rec. 214): "Whereas the said towns of Providence, Portsmouth, Newport, and Warwick, are far remote from each other, whereby so often and free intercourse of help, in deciding of differences and trying of causes and the like, cannot easily and at all times be had and procured of that kind is requisite," therefore full power to govern and rule themselves is given, "always reserving to the aforesaid general assembly power and authority to dispose the general government of that plantation as it stands in reference to the rest of the plantations, as they shall conceive, from time to time, most conducing to the general good of the said plantations." The charter of 1663 made a marked change in the conduct of public affairs. It concentrated power in the General Assembly. It gave that body authority to admit freemen; to elect and constitute such offices and officers as they should think requisite for the ordering and arranging the affairs of government; to make such laws as should seem to them meet for the government and ordering of the lands granted and the people inhabiting the same; to regulate the way and manner of all elections to offices; to prescribe and limit the numbers and bounds of cities and towns, as well as to do many other things, quite inconsistent with the powers reserved to towns under the first charter. The action of the Assembly was in accordance with the increased power. For example, in March, 1663, it established town councils, to consist of six members, including the assistants from the town, and as there were three assistants from Providence, elected by general vote, one-half of its town council might be elected by the votes of other towns. In March, 1669, in the case of a division in Providence, the Assembly

appointed a commission to call a town-meeting and to have charge of the election and the persons entitled to vote. In October, 1674, it transferred the probate of wills from the head officer of the town to the town council. All laws were made by the Assembly from that time on, and an inspection of them will show in how many ways the towns had advanced towards a stronger central government and relinquished the absolute control of their own affairs which they originally possessed. New towns were created; town boundaries were changed; towns were required to keep highways in repair; regulations were imposed in regard to erecting buildings; fire districts were established within towns, with power to levy taxes; authority was given to establish police regulations, subject to the laws of the State; and generally towns were treated as deriving their powers from the State, rather than from an independent right of local self-government. As to Newport, in May, 1784, without any request from the town, so far as appears, it was made a city, because, "under the present government of the said town, it hath been found impracticable to devise, consider, deliberate and determine upon all such laws and regulations as the emergencies of said town may, from time to time, require." In October, 1786, "the petition of divers inhabitants of the city of Newport, praying that the incorporation act of said city may be repealed and the charter annulled," was presented to the Assembly, and in March, 1787, the petition was granted, the charter annulled, and the city was made a town. The charter of 1853 was submitted to the people. Even as early as 1659 the Assembly ordered the towns to pay a part of the cost of building a prison in Newport. While this subject is more historical than legal, we have considered it to this length simply to show that the broad claim made and so urgently pressed by the petitioners cannot be sustained to the extent of holding that the constitution of the State must be interpreted according to an unwritten theory of local self-government, which so entered into its provisions as to make it controlling in construing those provisions. We do not find that the his-

tory of legislation in this State shows that the clause relating to the powers "retained by the people" necessarily implies that the General Assembly has no right to pass a law affecting a particular town or city. Indeed, the counsel for the petitioners concede that the Assembly may pass some such laws, but not to the extent of the one before us. If this much be granted, and we do not see that it can be denied, the question comes down to the validity of this particular law, so far as it affects the right to establish a police commission with power to appoint a chief of police.

Towns and cities are recognized in the constitution, and doubtless they have rights which cannot be infringed. What the full limit and scope of those rights may be cannot be determined in the decision of this case. The court cannot properly go beyond the question before it. We assume that the towns and cities in this State have the same rights which towns and cities have in other States under the prevalent form of State government. Our inquiry, therefore, is whether the establishment of police authorities by the State infringes the rights of self-government.

Obviously this must depend upon the status of a police officer. In *Kelley* v. *Cook*, 21 R. I. 29, this court has recently decided that he is an officer appointed to perform a public service, and in appointing him the mayor and aldermen of a city merely exercised one of the functions of government in which the city had no special interest and from which it derived no special benefit or advantage in its corporate capacity. A city, therefore, in preserving the public peace or enforcing the laws within its borders, is not acting for itself or for its own inhabitants merely, but for the whole people; in other words, the State. That which affects a part affects the whole. No one would question the right of the State to quell a riot, and yet even that would affect only a locality, not the whole State. If, then, a police officer does not perform a purely municipal but a State duty, how can his appointment affect the right of self-government? He is serving the State in the execution of its laws or those which have been specially

made under its authority. Chiefs of police of the towns and cities are made members of the State police by Gen. Laws cap. 102, § 17. The status, therefore, of the officer whose title to office is now before us would seem to be enough to settle this case were it not for the control of the police force vested in the commission, which is clearly an essential part of the act. There have been many cases upon legislation affecting towns and cities, and while there have been frequent expressions of opinion asserting in general terms the absolute right of local self-government as broadly as it is claimed in this case, yet the real line of decision in most cases other than those of express constitutional provisions is the one we have already suggested—whether the officer is one for the State or purely municipal service.

The Supreme Court of Michigan has been specially favored with this class of cases. In *People* v. *Mahaney*, 13 Mich. 481, an act constituting certain persons a police commission for the city of Detroit, embracing the powers conferred in the act before us with others much more extensive, was held to be constitutional. After considering objections not applicable to this case, Judge Cooley took up the objection to the act "on general principles and especially because violating fundamental principles of our system, that governments exist by the consent of the governed, and that taxation and representation go together." The court held that the objection was answered by the representation of the people of Detroit in the legislature which passed the act and in the election of the governor who appointed the board. Judge Cooley said : "There is nothing in the maxim that taxation and representation go together, which requires that the body paying the tax shall alone be consulted in its assessment, and if there were, we should find it violated at every turn in our system. The State legislature not only has a control in this respect over inferior municipalities, which it exercises by general laws, but it sometimes finds it necessary to interpose its power in special cases to prevent unjust or burdensome taxation as well as to compel the performance of a clear duty." *People* v. *Hurlbut*,

24 Mich. 44, was a case of a board of public works for Detroit. The constitutionality of the act was discussed but not decided. Campbell, C. J., who held the act to be unconstitutional, distinguished the case from *People* v. *Mahaney* upon the ground that the general purposes of the police act were such as appertain directly to the suppression of crime and the administration of justice, matters pertaining to the general policy of the State and subject to State management, while the public works act was evidently local and municipal.

*People* v. *Detroit*, 28 Mich. 228, involved the creation of a park commission, and, again distinguishing the case from *People* v. *Mahaney*, the court held that the people of other parts of the State had no right to dictate to the city of Detroit what fountains it should build or what land it should buy for a park or boulevard, at its expense, for the recreation of its citizens. *People* v. *Detroit*, 29 Mich. 343, was on the same subject. *Drain Com'r* v. *Baxter*, 57 Mich. 127, related to the authority of a drain commissioner to act outside of his township. *Wilcox* v. *Paddock*, 65 Mich. 23, held that the legislature had no power to authorize a judge of probate of one county to assess benefits upon lands outside of his county for a local improvement. *Metropolitan Police* v. *Board of Auditors*, 68 Mich. 576, held that the police commission of Detroit, paid for by the city, could not be assigned to duty in other townships. The Michigan cases, therefore, draw a clear line between local and State service.

In *People* v. *Draper*, 15 N. Y. 532, an act establishing the Metropolitan Police District was held to be constitutional; but it is to be observed that the constitution of New York authorized the legislature to appoint in any manner all officers, local or general, whose offices might thereafter be created by law. *People* v. *Shepard*, 36 N. Y. 285, was of the same character. *People* v. *Albertson*, 55 N. Y. 50, held an act to be unconstitutional creating the Rensselaer Police District, which extended the police force of Troy, maintained at its expense, to other towns, because it conflicted with the provision: "All town, city, and village officers whose election is

not provided for by this constitution shall be elected by the electors of such cities, towns, and villages."

*People* v. *Porter*, 90 N. Y. 68, held that the clause of the constitution giving the legislature authority to establish inferior local courts was limited to courts as historically known within recognized territorial divisions of the State, and that it did not authorize the splitting up of a county, city, town, or village for that purpose. In these last two cases *People* v. *Draper* and *People* v. *Shepard* were quite strongly criticised, but as the points of decision were different they were distinguished but not overruled.

In *Rathbone* v. *Wirth*, 150 N. Y. 459, an act for re-organizing the police department of Albany was held to violate the clause referred to in *People* v. *Albertson*, because it gave a minority of the council a right to elect police commissioners, restricting their votes to two when four were to be elected, and set up a partisan test of eligibility. *State* v. *Denny*, 118 Ind. 382, held an act to be unconstitutional which established, in cities of more than 50,000 inhabitants, a board of public works to have control of streets, sewers, lights, water supply, etc.

*People* v. *Lynch*, 51 Cal. 15, related to assessments for improving a street. *State* v. *Moores*, 55 Neb. 480, affirmed in *State* v. *Kennedy*, 83 N. W. Rep. 87, held that an act incorporating metropolitan cities, for which the governor should appoint fire and police commissioners, was violative of the right of local self-government.

These include all the cases relied on by the petitioners in support of the principle that an act of the legislature establishing a police commission for a city takes aways its right of self-government implied in the constitution. In all of them there have been very vigorous and cogent arguments in favor of the protection of that right, with which, in the main, we do not disagree. But it is evident from the points decided that, excepting in Nebraska, they have all involved a purely municipal office or have turned upon some express prohibition in the constitution. With the exception stated, not one

has denied the general power of the legislature to assume the control of the local police. In the cases cited Michigan has affirmed the power, Nebraska has denied it. The uniform decisions in other States, so far as they have come to our notice, have sustained the power. Following *People* v. *Draper*, in 1857, came *Mayor* v. *State*, 15 Md. 376 (1860), sustaining an act creating a board of police for the city of Baltimore. To the same effect was *State* v. *St. Louis*, 34 Mo. 546 (1864); *Ohio* v. *Covington*, 29 Ohio St. 102 (1876); *State* v. *Hunter*, 38 Kas. 578 (1888); *Commonwealth* v. *Plaisted*, 148 Mass. 375 (1888). *Trimble* v. *People*, 19 Col. 187, sustained an act authorizing the governor to remove a member of a fire and police board, but under constitutional provisions that do not apply to this case. *Burch* v. *Hardwicke*, 30 Gratt. 24, held that a chief of police was a State officer.

The clear weight of authority sustains the right of the legislature to control police, and equally is it sustained by sound reason.

The proposition of the petitioners goes too far. It assumes that because State control interferes at all with local control it violates the principle of local self-government. In any system of government, towns, as well as individuals, must yield something of individual independence for the public good. The most important laws are made by the legislature, and agencies are created to enforce them. Ordinarily the State makes use of existing agencies, like town or city officers, to do this, but none the less are they officers of the State. To say, therefore, that the State cannot assume control of these agencies in public affairs, is to say that a town can nullify a State law, which it does not approve, by choosing officers who will not enforce it. This is not the national doctrine, and, for a stronger reason, it cannot be the State doctrine. Two replies to this statement can be made. First, that the State can appoint its own officers to enforce its laws. To this we reply that economy and expediency at once suggest the futility of having two sets of officers whose duty it is to do the same thing, and also that we see no more infringement of the

right of self-government in appointing special State officers to execute a law than in requiring local officers to execute the same laws.

It may also be said that the court should not assume that local officers will not do their duty. The court does not so assume. The legislature has evidently made the assumption by the action it has taken, and, assuming its power, the question of policy is one for the legislature exclusively.

What the petitioners really claim is local independence rather than local self-government.

The whole doctrine of this case is summed up in *Burch* v. *Hardwicke*, 30 Gratt. 38, by Staples, J., after reviewing cases, as follows : " The distinction recognized in all of them is between officers whose duties are exclusively of a local nature and officers appointed for a particular locality, but yet whose duties are of a public or general nature. When they are of the latter character they are State officers, whether the legislature itself makes the appointment or delegates its authority to the municipality. The State, as a political society, is interested in the suppression of crime and in the preservation of peace and good order, and in protecting the rights of persons and property. No duty is more general and all-pervading than this. It extends alike to towns and cities as to the country. It looks to the preservation of order and security in the State, at elections, and at all public places ; the protection of citizens at railway stations, at steamboat landings ; the enforcement of the law against intemperance, gambling, lotteries, violations of the Sabbath, and, in fine, the suppression of all those disorders which affect the peace and dignity of the State and the security of the citizen. The instrumentalities by which these objects are effected, however appointed, by whatever name called, are agencies of the State, and not of the municipalities for which they are appointed or elected. ' The whole machinery of civil and criminal justice,' says a learned judge, ' has been so generally confided to local agencies that it is not strange if it has sometimes been considered of local concern. But there is a clear distinction in principle

between what concerns the State and that which does not concern more than one locality.' "

(1)    Our conclusion is that the right of a city to the sole control of its police force has not been so reserved as to bring it within article I, section 23, or article IV, section 10, of the constitution; that the act to establish a board of police commissioners for the city of Newport is not unconstitutional on the ground of interference with the right of that city to local self-government, so far as the appointment of a chief of police by said commissioners is concerned; that the petition, therefore, states no ground for relief.

The demurrer to the petition is sustained.

*Arnold Green, Amasa M. Eaton, and J. Stacy Brown*, for petitioners.

*Charles A. Wilson, William P. Sheffield, Jr., and Clark Burdick*, for respondents.