[No. 4498.]

# THE PEOPLE OF THE STATE OF CALIFORNIA *v.* MIKE LYNCH AND CERTAIN REAL ESTATE.

| | |
|---|---|
| 51 | 15 |
| 80 | 15 |
| 51 | 15 |
| 86 | 49 |
| 51 | 15 |
| 99 | 561 |
| 51 | 15 |
| 121 | 552 |
| 51 | 15 |
| 146 | 91 |

ASSESSMENT FOR IMPROVING A STREET IN A CITY.—An assessment made upon lots in a city for the purpose of improving a street, may be apportioned by reference to the number of front feet of the lots, or any other standard which will approximate equality; yet, whatever standard is adopted, it must be levied with uniformity and equality.

IDEM.—If, in levying such assessment, a lot of land within the district declared to be benefited is not assessed, and the whole expense is assessed upon the remaining lots, the whole assessment is void.

POWER OF LEGISLATURE TO LEVY AN ASSESSMENT.—The Legislature has not the power to levy an assessment not uniform and equal, in an incorporated city, for the purpose of improving a street, nor can it, after an assessment has been made by the municipal authorities for such purpose which is void for want of uniformity and equality, validate it.

IDEM.—The Legislature cannot directly exercise the power of assessment within an incorporated city, but may empower the municipal authorities to do so.

IDEM.—The Legislature cannot, by special act, deprive the city council or other appropriate local authority of a municipal corporation of all discretion in respect to a local improvement when, by the charter of the city, the matter of such improvements is left to the judgment and discretion of such local authority.

APPEAL from the District Court, Sixth Judicial District, County of Sacramento.

On the 12th of October, 1869, a petition was presented to the Board of Trustees of the city of Sacramento, signed by owners of lots fronting on Tenth street, between J and N, to have Tenth street, between said points, improved by grading and planking it. Sacramento lies on the east side of the river of that name, and the streets, commencing at the river, are numbered back east from one up to Tenth, Eleventh, etc. These streets run nearly north and south. The streets running east and west cross these at right angles, and are named by the letters of the alphabet, thus: A, B, C, D, etc. The Board of Trustees resolved to make the improvement; and having let the contract, the work was completed. The charter of the city required an assessment for such improvements to be levied on the lots fronting on each side of the street to the centre thereof, according to the number of front feet. For improving a street, where two streets crossed each other, the assessment was to be levied upon the quarter blocks lying at each of the four corners, according to the number of front feet of each on the street improved and on the cross street. M street, where it crossed Tenth street, was one hundred feet wide, and the quarter block at the northeast corner of M and Tenth streets was one hundred and sixty feet square, fronting one hundred and sixty feet on Tenth and one hundred and sixty feet on M street. The assessor, in making the assessment, left out the west one hundred and twenty feet front of said quarter block fronting one hundred and twenty feet on M street. The defendant, Lynch, owned the east half of lot four in the square bounded by M and N, and Ninth and Tenth streets, fronting one hundred and sixty feet on Tenth street, and it was assessed for six hundred and forty-four dollars and ninety-three cents, which he failed to pay, and this action was brought to enforce a lien for the sum assessed. The municipal legislative body for the city of Sacramento was a board of trustees. The following is the fifty-second section of its charter:

"In the public streets already laid out by lawful authority, opened and graded within the limits of said city, or which shall hereafter be laid out, opened and graded, as provided in this act, the paving, planking, draining and repairs of every kind shall be assessed upon and done at the equal expense of the adjacent lots on each side of said streets, each separate owner being at liberty and being required under the direction of the street commissioner to do, or cause to be done, at his own expense, the work, repairs and improvements in front of his own premises to the centre of the street. The expense of all such work, improvements and repairs upon each street-crossing, or the space formed by the junction of two or more streets, shall be assessed with equality upon each quarter block adjoining and cornering on the same, each distinct lot or parcel of lot included in such quarter being separately assessed for its equal proportion. For that purpose, all the blocks shall be considered as divided into quarters by straight lines through the centre of them, and running parallel with each of the streets bounded by said blocks. In cases where the blocks are of irregular shape and not bounded by parallel streets, so that they cannot be equally divided in that manner, the expense of constructing and repairing crossings, or that portion of them adjacent to such irregular-shaped blocks, shall be assessed as aforesaid with equality upon the lots in the whole block. The space formed by the junction of two streets terminating at the same point, if such a case should occur, shall be planked, paved, and kept in repair at the equal expense of the lots fronting thereon, and the contiguous quarter blocks."

The court below held that the assessment was void, but also held that it was validated by the act of March 30, 1874, referred to in the opinion, and enforced the lien. The defendants appealed.

*Armstrong & Hinkson*, for the Appellants, argued that the assessment was void because the Legislature had no power to make an assessment itself, and therefore could not validate a void one; and cited *Taylor* v. *Palmer*, 31 Cal. 249;

*Baltimore* v. *Horn*, 26 Md. 194; *Baltimore* v. *Porter*, 18 Md. 284; Dillon on Municipal Corporations, Secs. 45, 46.

They also argued that the assessment was void because a portion of the lots were left out; and cited *People* v. *Goldtree*, 44 Cal. 324; Cooley on Const. Lim. 382; *Washington Avenue*, 69 Penn. St. 362, 365; *Rutherford's Case*, 72 Penn. St. 85; *Palairet's Appeal*, 67 Penn. St. 479–486; *McDaniel* v. *Correll*, 19 Ill. 228; *Griffin* v. *Cunningham*, 20 Grat. 31–107; *Eddy* v. *The People*, 15 Ill. 386.

*C. T. Jones and Matt. F. Johnson and Ed. M. Martin*, for Respondent, argued that the Legislature had power to pass the curative act, because it could cure any irregularity in the performance of an act which it could authorize to be done, and that the Legislature had power to authorize an assessment to be levied, and therefore could validate an irregular assessment; and cited *San Francisco* v. *Canovan*, 42 Cal. 542; *People* v. *Holliday*, 25 Cal. 300; *Wallace* v. *Moody*, 26 Cal. 387; *Dentzel* v. *Waldie*, 30 Cal. 138; *San Francisco* v. *Canovan*, 42 Cal. 558; *Thompson* v. *Lee County*, 3 Wallace, 331; *McMillen* v. *County Judge and Treasurer of Lee County*, 6 Iowa, 391; *Watson* v. *Mercer*, 8 Peters, 108.

By the Court, McKINSTRY, J.:

The action is on an alleged assessment for planking Tenth street, from J to N streets, in the city of Sacramento.

As conclusions of law, the court below found that the order of the Board of Trustees, directing the grading and planking was *void*, because the board did not acquire jurisdiction to make it; that the contract for planking was also void, and that the assessment was void, because the same was not made in pursuance of the city charter. The court further found that all the proceedings had been *legalized* by the act of the Legislature, approved March 30, 1874, "to legalize the assessment of a street tax in the city of Sacramento," the first section of which reads:

"The assessment upon all lots fronting on Tenth street, between J and N streets, in the city of Sacramento, levied on the 20th day of December, 1869, for the purpose of

planking Tenth street, between J and N streets, *is hereby made legal and valid,* and all acts of the Board of Trustees of said city in relation thereto shall have full force and effect, and said tax so levied upon said lots *shall be a lien thereon until paid.*"

For the purpose of the present case, I am willing to admit the entire accuracy of the rule, said by Cooley to be applicable to statutes passed to cure irregularities in the assessment of property for taxation: "If the thing wanting, or which failed to be done, and which constitutes the defect in the proceedings, is something the necessity of which the Legislature might have dispensed with by prior statute, then it is not beyond the power of the Legislature to dispense with it by subsequent statute." (Const. Lim. 371.)

Passing the questions made below as to the *identity* of the assessment which the act attempted to validate, the District Court erred in holding that the act legalized the illegal proceedings.    And this for three reasons:

1. The assessment which it attempted to legalize was entirely wanting in the elements of equality and uniformity, according to any standard or system of apportionment, and therefore could not have been directly levied by the Legislature.

2. In California, the power of "assessment"—distinguished from that of taxation as ordinarily employed—cannot be directly exercised by the Legislature, within the limits of an incorporated city.

3. The inhabitants of a city cannot be deprived of their right to have such matters as are placed by the charter under the supervision and control of the legislative department of the city government, passed upon by their representatives in the city council.    The Legislature cannot, in a special case, deny to the proper city authorities that discretion which they may ordinarily employ with respect to local improvements.

I. As I understand it, the court below distinctly found that a lot of land, within the district declared by the charter and law to be benefited by the alleged improvement, was not assessed at all.    Assuming that the act (in connection with

the charter and attempted assessment) is to be read as if it, in terms, declared that a public work had been done, which was of benefit to the same property which would have been benefited if the work had been regularly ordered, it assesses all the lots within the district benefited, except certain lots which it releases from liability for the benefit received.

An "assessment" for a local improvement is a *tax,* differing from other taxes in that it need not be levied upon the *ad valorem* principle. Although such assessment is not prohibited by that clause of the State Constitution which provides that "all property shall be taxed in proportion to its value," it is of the very essence of taxation, *in every form,* that it be levied with equality and uniformity; and to this end, that there should be some system of apportionment. (*Taylor* v. *Palmer,* 31 Cal. 241.) These assessments may be apportioned by reference to the number of feet fronting on the improvement, or to any other standard which will approximate exact equality and uniformity; but whatever the basis of taxation, the requirement that it shall be uniform is universal, the difference being only in the character of the uniformity. The terms "tax" and "assessment," except in the case of specific taxation, both include the idea of some ratio or rule of apportionment; so that, of the whole sum to be raised, the part paid by one piece of property shall have some known relation to, or be affected by, that paid by another. (*Woodbridge* v. *Detroit,* 8 Mich. 301; *People* v. *Mayor, etc. of Brooklyn,* 4 N. Y. 419.)

Abstractly, the idea of taxation involves the distribution of the burden, with equality and uniformity, upon *all* the property throughout the State, or district. But it was said in *Merritt* v. *Farris:* "The Constitution, in its application to the various departments of the Government, and to individual rights, must receive such a construction as to give it a practical operation." (22 Ill. 311.) And, in the same case: "The framers of the Constitution could not have designed that such an omission (to assess an individual, or particular property) should avoid the tax levied on the property which is regularly assessed. *They intended to require, and did require that the law should provide for a uniform mode of*

*assessment and collection, which would not sanction exemption from the burdens of taxation,* and they imposed the duty upon the officers acting under the revenue laws, of executing them fairly and impartially; but it never could have been intended that their omissions should render the whole tax void, and suspend the collection of revenue. If an officer willfully and corruptly, or from gross negligence, were to make such omissions, he would doubtless be liable in damages to those suffering injury" (p. 312). And it was there held, that the omission of the district clerks to place on the tax-roll the names of certain property-holders within a school district, did not vitiate the whole tax.

Elsewhere—and the difference seems to be recognized by the weight of authority in other States — a distinction is made between mistakes of fact, erroneous computations or errors of judgment, by those to whom the execution of the taxing laws is intrusted, and the *intentional disregard* of such laws in such manner as to impose illegal taxes on those who are assessed. In *Weeks* v. *Milwaukee* (10 Wis. 242), Paine, J., speaking for the court, after declaring a rule based on the foregoing distinction, and that where mere mistakes occur on the part of officers who are endeavoring, in good faith, to discharge their duties, they ought not to invalidate the whole levy, adds : "It seems to me, the other part of the rule is equally essential for the protection of the citizen. If those executing these laws may deliberately disregard them, and assess the whole tax upon a part only of those liable to pay it, and have still a legal tax, then the laws afford no protection, and the citizen is at the mercy of those who, by being appointed to execute the laws, would seem to be thereby placed beyond legal control. I know of no considerations of public policy or necessity that can justify carrying the rule to that extent."

In the present case (whatever may be the rule as to executive officers, such as assessors charged with duties ministerial in their character), it is unnecessary to go further than this: The constitutional limitation, that taxation shall be equal and uniform, including the proposition, that by the law levying it it shall be a burden on all property simi-

larly affected, or in the same relation to the purpose of the tax and to the taxing-power, applies with full force to the action of the Legislature. While, therefore, if a law shall provide for a tax in conformity to the Constitution, errors in judgment on the part of the agents appointed to assess (or even intentional omissions), may not invalidate the whole levy, an attempt by the Legislature to release certain of the property from its proportion of the tax would be of none effect.

In *Crosby* v. *Lyon* (37 Cal. 243), where the tax had actually been assessed and collected of the company, it was held that a statute providing for a return to a railroad company of its part of a school tax lawfully levied within a county was in contravention of the section of the Constitution which declares that taxation "shall be equal and uniform," etc. And in *People* v. *McCreery* (34 Cal. 432), this Court decided that the Legislature had no power to exempt from taxation any private property in this State. In that case the judgment did not invalidate the entire levy, because, as was held in effect, the attempted exemption only was void, and the assessors were authorized to assess the property which the statutes pretended to exempt; and, although it was the duty of the assessor to assess all the property in his district, his omission to assess part, under the circumstances, did not render his whole action void.

But the act of March 30, 1874, contains no provision for a future assessment by any officer or agent of the State, of the property within the district declared by the legislative recognition of the proceedings under the charter to have been benefited by the improvement of Tenth street, or of the lots omitted in the attempted assessment which it was the object of the act to validate. The act, if it be retroactive at all, must be the same as if it had declared certain tracts of land to have been benefited by the local improvement, and had further enacted that parts of the tracts should pay the whole cost. It has been repeatedly held, that an attempt by the Legislature to compel each lot upon a street to pay the whole expense of grading and paving along its front cannot be maintained, because, while there is an ap-

parent uniformity, the measure of equality required by the Constitution is entirely wanting. (9 Dana, 513; 8 Mich. 274.)  It is far more clearly a violation of the constitutional principle of equality and uniformity to require of one lot, or any number less than all, to pay for all within an assessment district.

In the case at bar, the assessment, such as it was, was completed prior to the curative act, so called.  The Legislature attempted to ratify that very assessment, with all its imperfections on its head, including the defect, that part of the property within the assessment district had not been charged at all.  This cannot fairly be treated as a law providing for the levy of an assessment within a certain district, and appointing officers to make it, whose errors, perhaps, might not vitiate the entire levy.  This act, at best, is an attempt directly to levy a contribution within a certain district; to declare that each lot named shall pay a sum, arbitrarily fixed, as its portion thereof, and that particular lots shall pay nothing.  Such a statute, if prospective, would undoubtedly be invalid, as clearly a violation of principles recognized and established by the Constitution of the State.

II. The power of "assessment" cannot be directly employed by the Legislature within the limits of an incorporated city.

In *Taylor* v. *Palmer* (31 Cal. 252), it was said: "It is true that the power of assessment is vested in the Legislature, but it is so in a modified sense.  It is not so vested as an independent or principal power, like that of taxation, but as a part of and as an incident to the power of organizing municipal corporations, and providing for them a system of government, to the proper working of which the power of assessment is indispensable.  It was not intended that the power of assessment should be exercised by the Legislature, and it never can be, except through the intervention of a municipal corporation; for, whenever the Legislature undertakes to exercise the taxing power directly, it works under the power of taxation as distinguished from that of assessment."

And again: "It results that the Legislature not only may

grant, but must grant to one of its creatures a power which it is not permitted to exercise in its own capacity; or, to observe greater exactness, the privilege of exercising the power of taxation for certain purposes in a mode in which the Legislature is forbidden to exercise it" (p. 253).

The foregoing language is to be construed with reference to the facts of the case then before the court. The learned judge who delivered the opinion in *Taylor* v. *Palmer* was discussing the power of "assessment" *within a city*, and the conclusion was, that within corporations strictly municipal, the power cannot be directly exercised by the Legislature. Thus construed, the case of *Taylor* v. *Palmer* accords with the subsequent ruling in *Hager* v. *Supervisors of Yolo* (47 Cal. 234), where it was held that, outside of such municipalities, the Legislature might authorize the employment of the power by local boards.

This power of "assessment" is only mentioned in the Constitution in that section which provides for the organization of cities and incorporated villages. (Art. IV, Sec. 37.) It is spoken of as a power of municipal government, familiarly known and well understood, both by the framers of the Constitution and by the people at large; and the Legislature is commanded to restrict the power "so as to prevent abuses in assessments." It is a power which, from its very nature, can only be prudently employed by those in whom it is exclusively vested. Bearing this in mind, the language of the section above referred to, which provides for the prevention of abuses by legislative restrictions, would seem fully to justify the conclusion reached by this Court in *Taylor* v. *Palmer*, that the power of assessment can only be exercised through the medium of the corporate authorities.

Conceding, therefore, the principle bearing upon retrospective laws to be as claimed by respondents, the Legislature could not originally have levied the assessment which they attempted to validate by subsequent acts.

III. The Legislature cannot deprive the city council, or other legislative body, of all discretion with respect to a local improvement within the limits of a city, when by the

charter the matter of such improvements is confided to the judgment and discretion of the local body.

First. Before proceeding to the consideration of this last point, I propose to indicate what I conceive to be an erroneous view in respect to the exercise by the courts of the power of declaring statutes in conflict with the State Constitution.

It is often assumed, and sometimes asserted, that it is the duty of the judges to sustain, by strained interpretation, a law, which at first view is in apparent derogation of that instrument. I concede that a court should hesitate to declare a law unconstitutional, as it should render any decision involving important consequences only after due deliberation. But on the other hand, the judges may not indulge an indisposition to assume responsibility by falling back upon phrases used by jurists, however distinguished, which, fairly construed, mean only that great caution is to be employed in this as in other judicial action.

Since the case of _Sharpless_ v. _The Mayor_, _etc._ (9 Harris, 147), perhaps no argument has been made in favor of the constitutionality of a statute in which the language of the Chief Justice of Pennsylvania has not been quoted: " We can declare an act of the Assembly void, only when it violates the Constitution clearly, plainly, _and in such manner as to leave no doubt or hesitation in our minds_." Yet it is manifest that the accumulation of adverbs and clauses, while it may give euphony to the sentence, adds no force to the meaning, which remains the same as if the able judge and brilliant writer had said that a court must be clearly satisfied that a law is unconstitutional before it can declare it to be so.

He certainly did not mean that a statute should be upheld whenever a doubt could be suggested that it might be constitutional; for this would be an abdication of the judicial function of determining the validity or invalidity of statutes on that ground. The courts cannot shirk the responsibility of deciding such questions, when presented. It is as much their duty to consider the Constitution, in ascertaining what

is the law, as to consider the statute. This duty must be performed, whatever the consequences.

"The judicial department is the proper power in the Government to determine whether a statute be or be not constitutional. The interpretation or construction of the Constitution is as much a judicial act, and requires the exercise of the same legal discretion, as the interpretation or construction of a law. To contend that the courts of justice must obey the requisitions of an act of the Legislature, when it appears to them to have been passed in violation of the Constitution, would be to contend that the law was superior to the Constitution, and that the judges had no right to look into and regard it as a paramount law.

"The attempt to impose restraints upon the exercise of the legislative power would be fruitless, if the constitutional provisions were left without any power in the Government to guard and enforce them." (1 Kent's Com. 449.)

However apt the expression, "beyond all reasonable doubt," when referred to the action of a jury upon an issue of fact in a criminal case, the words have no peculiarly appropriate application to the action of a court upon any issue of law; since, in theory, every adjudication is made after full consideration of all doubts of its correctness.

Nor is it true that we can never hold a law void, unless we can find in the Constitution some specific inhibition which, in precise language, refers to the particular law. Human ingenuity would fall short of anticipating every possible *mode* by which might be consummated an abuse of legislative power, which the people, in constitutional convention desired to guard against. The providence of constitution-makers must find expression in broader terms; but whether restrictions on the legislative power be declared as general and affirmative propositions, or appear as necessary inferences from a comparison of different portions of the Constitution, it is equally the province of the courts to determine whether a particular law falls within any of them. It is not for the judiciary primarily to inquire whether the Legislature has violated the *genius* of the government, or

the principles of liberty, or rights of man, or whether its acts are expedient, but only whether it has transcended its powers. (Dwarris on Statutes, 269.) It does not result, however, that in every case the courts, before they can set aside a law as invalid, must be able to find in the Constitution some specific inhibition which has been disregarded, or some express command which has been disobeyed. (Cooley, Const. Lim. 171.)

Under our Constitution the Senate and Assembly can perform any legislative act not prohibited, not because there is any magic in these names which absorbs all power not specifically conferred on the other departments of government, but because the Constitution places the legislative power in the Senate and Assembly in general terms. By the tenth amendment of the Constitution of the United States, it is provided: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, *or to the people.*" The Government of the United States can exercise only such powers as are expressly granted to it, and such as are necessarily implied from those granted. It follows from this, that the people of the States respectively retain such powers as have neither been granted, expressly or by implication, to the Government of the United States, nor conferred on the State governments.

It is by no means a corollary from the foregoing proposition, however, that one *department* of the State government may employ all the powers not granted to the Federal government. It is undoubtedly true, in a certain sense, that the State Constitution is to be construed as a *limitation* upon and not as a grant of legislative power; that is to say, the general power of making laws having been placed by the people in the Legislature, the Legislature will be held to have power to make any law which it is not prohibited from making by the Constitution of the State or of the United States. In this respect the rule of interpretation is the reverse of that applicable to acts of Congress under the Constitution of the United States. But the "sovereignty of the people" is more than a meaningless phrase.

The people of California created the State government, and it was for this people to place (in the State Constitution) as many checks upon, and conditions and limitations of the general grant of legislative, executive or judicial power as they deemed proper or expedient. "The people of the State alone possess and can exercise supreme and absolute authority; the Legislature, and the other departments of government, are but the depositaries of delegated powers more or less limited"—according to the terms of the Constitution. (1 Sharswood's Black. Com., ch. 2, note.)

The Constitution of California is more than a collection of suggestions or "directory" clauses as to the employment of the powers of legislation by a body which—like the Parliament of Great Britain—is omnipotent. It purports to contain, and does provide, an entire framework of government. It divides the powers of this government into three departments, no one of which is freed of the restrictions declared or necessarily implied from the instrument as a whole. We are to ascertain the meaning of the Constitution by an examination of all of it; and in making such examination, effect is to be given, if possible, to every section and clause. It is not to be supposed that any words have been employed without occasion, or without intent that they should have effect as part of the law. (Cooley, Const. Lim. 58.) The real question in the construction of the Constitution, as in the construction of a statute or of a contract, is, What is meant by the language employed? We should read it with a view to finding out the *thoughts intended to be expressed*. (*Twitchell* v. *Blodgett*, 13 Mich. 138.) In interpreting separate clauses we must presume that words have been used in their ordinary sense. (*Gibbons* v. *Ogden*, 9 Wheat. 188.) But we should see if the meaning of any one clause is qualified or illustrated by other clauses. If words are used which are employed in a certain sense in the constitutions or statutes of other States (adopted or enacted prior to our own), it is proper to consider them as employed in the same sense in our Constitution, unless the context indicates that they were intended to convey a different idea. (*Taylor* v. *Palmer*, 31 Cal. 240; *Ex parte Wall*, 48 Cal. 279.)

When the intent is not perfectly obvious from the language, we may regard the evil intended to be prevented, if discoverable in the history of legislation in this and other States; in short, if a law is to be tested by the Constitution, "it is the duty of the court to make such a decision as accords with its carefully formed and settled conviction, after using all accessible means of enlightenment." (*People* v. *Blodgett, supra.*)

Second. Bearing in mind the principles of construction above mentioned, I proceed to inquire, What did the framers of our Constitution mean, when, after declaring in general terms that the law-making power should be vested in the Senate and Assembly, and requiring the establishment of a system of county and town governments, they further provided:

"It shall be the duty of the Legislature to provide for the organization of cities and incorporated villages, and to restrain their powers of taxation, assessment, borrowing money, contracting debts, and loaning their credit, so as to prevent abuses in assessments and in contracting debts by such municipal corporations." (Art. IV, Sec. 37.)

"Each county, town, city and incorporated village shall make provision for the support of its own officers, subject to such restrictions and regulations as the Legislature may prescribe." (Art. XI, Sec. 9.)

Had the Constitution of California been silent in respect to cities and incorporated villages, the Legislature would have possessed the power to create them; but it would perhaps have been more difficult to say whether the people could not have been deprived of these local governments. So impressed, however, were the framers of that instrument with the propriety and necessity of such legislation, that they inserted the sections above quoted. What did they have in their minds when they spoke of cities and villages? It needed but to recall their origin and history to impress the Constitutional Convention with a conviction that municipalities are invaluable to a great and free people. The enlightened genius of the Roman civilization was planted and fostered by the establishment of colonies with urban

privileges.    In the Dark Ages the chartered towns in
Europe served to curb the turbulence of the more potent of
the crown vassals, and to erect barriers for the protection
of personal rights against the rude force of the feudal
barons.    It often happened that from such centres of self-
government the spirit of freedom was extended and ex-
panded, and it may safely be said of the English boroughs
—for example—that they were largely instrumental in de-
veloping the constitution of government which made that
people jealous of the liberty they possessed, and capable of
receiving still greater accessions of the same blessing.    In
our own country the existence of local political corporations
began with the earlier settlement of the colonies.    The
benefits of such subordinate communities as schools of prep-
aration for the discharge by the citizen of the duties he
owes to his country at large, have been highly estimated by
philosophical writers who have given their attention to the
subject,—the distinguished author of *La Democratie en
Amerique* considering the New England "towns"—which
are like cities in so far as they possess certain powers of
government—as the very life of American liberty.    The ad-
vantage of having the home work done at home commends
itself to every mind.    The extreme inconvenience, to say
the least, of an interference on the part of the State, by
*special legislation,* with the innumerable details of adminis-
tration in every locality, especially in the more densely
populated portions of our territory, is manifest to all prac-
tical men.    If there is danger in a city that the indifference
of the more honest and intelligent may suffer the corrupt
to seize and abuse the local authority, this risk equally
exists with reference to the State or National Government.
To a certain extent the danger that people may neglect their
public duties exists everywhere, and can only be guarded
against by greater diligence; it is an incident to our form
of government—the price which we pay for our inestimable
freedom.    Assuming that a people of a municipality are fit
to govern themselves, no one can hesitate to believe that
any possible contingent evils of municipal government are
more than compensated by the direct representation in the

local councils of those peculiarly, and often exclusively, interested in the conduct of the municipal affairs. It was, amongst other things, to do away with frequent interference by the central power with matters of purely local concern, that cities and incorporated villages had been created in every State of the Union.

All these considerations may be supposed to have been present to the minds of the members of the Constitutional Convention. When they required that the Legislature should organize cities and villages, they were doubtless actuated by a sense of the vast consequences of such corporations, entering, as they do, into the foundation of our political economy.

A system of territorial subdivisions and municipal organizations existed in California when our Constitution was adopted. But a very large majority of the inhabitants of California, as well as of the members of the convention, were recent immigrants from States where the common law prevailed as the basis of jurisprudence, and it was to the cities and villages there in operation that reference was made in the clauses of the Constitution. The convention used the terms as they had been employed throughout the United States, when employed at all; and the very idea of an American city involves the notion of a local government; of local officers selected by the inhabitants, and reflecting the wants and wishes of the inhabitants; and that these officers should exercise their own judgment in respect to the internal affairs committed to their charge by the law of their creation. The Legislature can alter or repeal a city charter, but it does not follow that the Legislature can deprive the aldermen, councilmen, supervisors or trustees of a city of all discretion in the discharge of their functions as such.

In *Ex parte Wall,* supra, we held that the words "system of county and town governments" referred to county and town governments in their general features, like those of the States where county and town governments had been established. It is equally plain that the "cities and incorporated villages" required to be created by our Constitution,

are cities and incorporated villages with *franchises* similar to those enjoyed by municipal corporations in other States. From the very nature of such corporations, and from what has already been said as to the intent of the Constitution that the legislative body of a city shall exercise choice and judgment with reference to expediency of action in matters appropriately confided to their care, it would seem to follow that the Legislature has no reserved power to set aside such choice or judgment, or to supersede the employment thereof in a particular instance.

As is said by Chief Justice Campbell, in *People* v. *Hurlbut* (24 Mich. 87), "We must never forget, in studying the terms of the Constitution, that most of them had a settled meaning before its adoption. Instead of its being the source of our laws and liberties, it is, in the main, no more than a recognition and re-enactment of an accepted system. The rights preserved are ancient rights, and the municipal bodies recognized in it, and required to be perpetuated, were already existing with known elements and functions. They were not towns, or counties, or villages, in the abstract, or municipalities which had lost all their old liberties by central usurpation, but American cities," etc. In the same case Mr. Justice Cooley—than whom no more distinguished expounder of constitutional law is recognized in this country—said: "We must assume either an intention that the legislative control should be constant and absolute, or, on the other hand, that there are certain fundamental principles in our general framework of government which are within the contemplation of the people, when they agree upon the written charter; subject to which the delegations of authority to the several departments of government have been made. That this last is the case appears to me too plain for serious controversy. The implied restrictions upon the power of the Legislature, as regards local government, though their limits may not be so plainly defined as express provisions might have made them, are, nevertheless, equally imperative in character, and whenever we find ourselves clearly within them, we have no alternative but to bow to their authority. The Constitution has been framed with

these restrictions in view, and we should fall into the grossest absurdities if we undertook to construe that instrument on a critical examination of the terms employed, while shutting our eyes to all other considerations. The circumstances from which these implications arise are: First, that the Constitution has been adopted in view of a system of local government, well understood and tolerably uniform in character, existing from the very earliest settlement of the country, never for a moment suspended or displaced, and the continued existence of which is assumed; and, second, that the liberties of the people have generally been supposed to spring from and be dependent on that system." (97–8.)

The State Legislature may perhaps provide for an inquiry, in the first instance, into the propriety and feasibility of a project affecting exclusively the interests of the people of a city by persons or officers other than the members of the local legislature. There may be no serious objection to this, provided the action of such persons is merely advisory. But the definite and ultimate determination, which shall conclude the taxpayers of a city, must be that of the appropriate local legislature. This question was fully considered in *The People* v. *The Common Council of Detroit* (28 Mich. 228). The Legislature of Michigan had passed an act appointing a board, who by the terms of the law had absolute power to purchase lands for a park in the city of Detroit, and on whose report the common council were commanded to make provision to pay for the land, by issuing bonds, etc. The Supreme Court of that State held the law to be unconstitutional, as being an attempt to transfer to a board appointed by the Legislature, a discretion which the common council alone could be authorized to employ.

The argument there on the part of the relators—the park commissioners—was: As the State may create and abolish municipal corporations, and defines and limits their powers at will; as it confers, amongst others, the power to make contracts and to levy taxes for their performance, it may do directly what it may do indirectly; it is not limited to conferring a discretionary power, but may command the muni-

cipal legislature to make a particular contract, and compel it to levy taxes to satisfy the obligation assumed by the State for the local government. But the court held, in effect, that under the Constitution of that State, the Legislature could only create cities with municipal legislatures elected by the inhabitants, or some of them, with discretionary power in respect to the matters of a local character committed to their charge. Similar views were expressed by the Supreme Court of Illinois, in *The People* v. *Mayor of Chicago* (51 Ill. 17), that court holding: "While it is conceded that municipal corporations, which exist only for public purposes, are subject at all times to the control of the Legislature creating them, and have in their franchises no vested right, and whose powers and privileges the creating power may alter, modify, or abolish at pleasure, yet that power cannot be so used as to compel such a corporation to incur a debt without its consent—to issue its bonds against its will for the erection of a public park, or for any other improvement."

An attempt by the State Legislature to order an improvement within the limits of an incorporated city, and to levy an assessment to pay for it, is as clearly a violation of the independence of action guaranteed by the Constitution to the local legislative assembly, as is a mandate directed to that assembly, commanding them to make such improvement, and to borrow money, or to tax all, or a portion, of the citizens to pay for it, contrary to the wish of the assembly, and to that of the local community whom they represent. Such law is unconstitutional, because it is mandatory in its nature, and deprives the board of trustees, or legislative department of the city government, by whatever name it be known, of all choice or discretion in reference to the improvement.

There is no force in the suggestion that the doctrine here asserted will lead to a nullification of general laws, or to a *communism* as objectionable as an extreme centralization.

"There is a clear distinction between the functions of officers whose jurisdiction is limited territorially, considered as agents of the people of the State, and as agents of the people

of the municipality.  The only confusion existing on this subject has arisen from the custom, prevalent under all free governments, of localizing matters of public management, so far as possible, and of making use of local corporate agencies, whenever it can be done profitably, not only in local government, where it is required by clear constitutional provisions, but also for the purposes of State." (Per Campbell, J., in *People* v. *Common Council of Detroit, supra.*) "It is important to bear in mind the distinction between State officers—that is, officers whose duties concern the State at large, and the general public, although exercised within definite territorial limits—and municipal officers whose functions relate to the particular municipality." (Dill. on Municipal Corporations, 33.)  The same individual may unite in himself capacities of a State and municipal officer, but as to the matters in respect to which he acts for the State, he is not a city officer, but a State officer.  There is nothing in the nature of things which precludes us from declaring that an officer in his municipal capacity may be clothed with functions and be entitled to immunities with which he is not vested, and which he cannot claim, as agent of the State at large.

Third.  I think this Court is not estopped from responding to the question last considered, in such manner as shall accord with our convictions of what the law demands.

Our attention has been called to *San Francisco* v. *Certain Real Estate* (July term, 1872), as precluding the further consideration of that question.  In that case no opinion has been reported.  It was decided from the Bench on the supposed authority of *Blanding* v. *Burr,* 13 Cal. 343; *People* v. *San Francisco,* 36 Cal. 595; *Sinton* v. *Ashbury,* 41 Cal. 530; *San Francisco* v. *Certain Real Estate,* 42 Cal. 515; *San Francisco* v. *Canavan,* and *Hotaling* v. *Canavan,* Id. 541.

Taking up these cases in reversed order, I find the main question, of itself decisive of the cases discussed in *San Francisco* v. *Canavan* and *Hotaling* v. *Canavan,* is the character of the title to the *pueblo* lands, the Court saying: "The authorities cited completely establish that the tenure by which these lands are held is totally different from that by

which lands acquired by a municipality, by gift or pur-
chase, are ordinarily held; and *whatever may be the extent of
the legislative power* over the latter class of lands, there can be
no doubt that, in respect to *pueblo* lands, it is competent for
the Legislature to control and direct how they shall be man-
aged and controlled, or disposed of by the municipal corpo-
ration.". In respect to the subject suggested by the question
we have been considering, no argument was made by the
court or counsel in *San Francisco* v. *Canavan;* nor is that
subject referred to in *San Francisco* v. *Certain Real Estate*
(42 Cal. 515).

In *Sinton* v. *Ashbury* it seems to have been *conceded* by
counsel that the Legislature has power by special act to di-
rect and control the disposition of the funds or property of
a municipal corporation for a municipal purpose.   (41 Cal.
530.)   With the premises conceded, of course the Court in
that case had only to ascertain whether a certain purpose
was municipal.   *People* v. *San Francisco* determines a par-
ticular statute to be mandatory—the only point discussed
by counsel—and *assumes* the power to pass such mandatory
statute.   Thus it is seen that of the cases cited in *San Fran-
cisco* v. *Certain Real Estate* (July term, 1872), all the others
rely on the reasoning of *Blanding* v. *Burr* (13 Cal. 343).
And this is also true of *Creighton* v. *San Francisco* (42 Cal.
450).   But before commenting on *Blanding* v. *Burr*, it will
be well to refer to other cases cited in *Sinton* v. *Ashbury*
(supra).   They are: *People* v. *Alameda* (26 Cal. 650), and
*Beals* v. *Amador* (35 Cal. 632), which also depend on *Bland-
ing* v. *Burr; People* v. *McCreery*, which has no immediate
bearing on any point involved in the present controversy;
*Sharp* v. *Contra Costa*, wherein it was held that a county
could not be sued in the absence of a statute authorizing
such suit; and *People* v. *Board of Supervisors, etc.* (11 Cal.
206), where the Court says: "The interesting question
argued at the Bar, as to the extent of the power of the Leg-
islature over the finances of the municipality, does not arise
in this case."

In respect to *Blanding* v. *Burr*, I remark:

(*a.*) We can agree to the judgment in that case without assenting to the views presented in the opinion of the Court.

Burr, one of the Board of Fund Commissioners, refused to sign certain bonds to be delivered to the relator, in the amount of a claim in his favor against the city, allowed by the Board of Examiners. Burr took the ground that the claim should not have been allowed, inasmuch as the Common Council had no power to create the liability, having already (when relator's claim accrued), created an indebtedness of more than $50,000 beyond the annual revenue; and he relied on a clause of the city charter, which reads: "The Common Council shall not create, nor permit to accrue, any debts or liabilities which, in the aggregate with all former debts and liabilities, shall exceed the sum of $50,000 over and above the annual revenue of the city," etc. Had the point made by defendant in that case been decided against him, it would not have been necessary to determine that the Legislature had power to compel a municipal corporation to provide for the satisfaction of a supposed obligation which was incapable of enforcement at law or in equity. It is true the Court did not decide the point made by Burr, but, on the contrary, declared it unnecessary, in their view of the case, to construe the clause of the statute. But the same clause is thus treated in the able opinion of Mr. Justice Cope, in *Argenti* v. *San Francisco* (16 Cal. 264): "We regard this provision as directory to the Common Council, and not as a limitation upon the power of the city. It was too indefinite and uncertain to admit of any other construction. Of course, the amount of the annual revenue of the city was incapable of ascertainment in advance of its collection, and it could not have been intended that a debt contracted by the city should be valid or invalid, as the revenue of the year might exceed or fall short of a particular amount." And in *Babcock* v. *Goodrich* (47 Cal. 513), this Court held a similar provision as to the power of supervisors (Political Code, Sec. 4070) to be directory simply, saying: "The word revenue, as used in the section, cannot mean that the actual money which shall be received in the county

treasury.  *  *  *  It is the *estimated* revenue which the
law-makers had in contemplation. It is their estimate of
the revenue at the time an account is presented which must
control the action of the board."

(*b.*) It is to be observed, also, that in *Blanding* v. *Burr*
it was assumed that the only constitutional restriction upon
the power of the Legislature to tax, and dispose of the pro-
ceeds of taxation, is to be found in the Eleventh Article of the
Constitution—that which provides for equality and uniform-
ity. The Court did indeed refer to that portion of the thirty-
seventh section of Article IV, which enjoins upon the Legis-
lature the duty to restrict cities and incorporated villages
in their powers of taxation and contracting debts, and held
that this only imposes the obligation on the Legislature to
prevent *abuses* in assessments and in contracting debts,
and does not prohibit the conferring of new and enlarged
powers on municipal governments. The same view of that
question was taken in *Grant* v. *Courter* (24 Barb. 241). But
in *Blanding* v. *Burr*, the Court does not seem to have ad-
dressed itself to the broader question which has now been
considered, and which may be stated thus: Do the consti-
tutional provisions which require the establishment of cities
and incorporated villages, construed in the light of the his-
tory of such municipalities and the traditions of our people,
restrict the general powers of the State Legislature, so that
they can neither compel a city to create a debt or levy a
tax for a particular city purpose, nor directly intervene to
levy an assessment on the property of the whole body, or a
portion, of the citizens, for a particular municipal improve-
ment?

Nor was this question discussed in the New York cases
especially referred to in *Blanding* v. *Burr*.

The statute decided to be constitutional in *The People* v.
*The Mayor of Brooklyn* (4 N. Y. 219), was a statute *author-
izing* a municipal corporation, at the discretion of its officers,
to employ the powers of assessment, etc. And in the *Town
of Guilford* v. *Cornell* (18 Barb. 615, 13 N. Y. 143), the
courts held that none of the constitutional provisions *relied
on by counsel* constituted a prohibition of the act compelling

the Supervisors of Chenango County to levy a tax, for the purpose in the act indicated, upon the inhabitants of the town of Guilford. The constitutional objections urged against the act, and which were held to be invalid, were: 1. That the *title* was informal. 2. That the act was an assault on private rights. 3. That it was an attempt to deprive citizens of their property without due process of law. 4. That it was an attempt to exercise *judicial* functions.

It may be further said, in reference to the *Town of Guilford* v. *Cornell*, that the Court of Appeals placed peculiar stress upon a provision of the New York Constitution, which seemed to authorize an appropriation for local purposes by a vote of two-thirds of the members of each branch of the Legislature (Art. 1, Sec. 9), Mr. Justice Denio saying: "There is no question but that this law received the requisite vote." (13 N. Y. 149.)

(c.) If the precise question which has been herein considered had been passed upon in *Blanding* v. *Burr*, this Court would not be estopped from considering it anew. It has happened, in the history of the States, that the framers of a constitution have been more provident than perhaps they themselves understood—certainly than judges at first view have supposed — and have actually provided checks against evil legislation, which was subsequently assumed not to be prohibited. If after-events have made apparent the enormity of an evil, and upon fuller consideration a court is satisfied that a former judgment is wrong, it ought not to be precluded from asserting the correct rule, unless some principle of public policy shall intervene; as when the establishment of the true rule would so disturb vested interests as would constitute a greater evil than would result from holding fast by the former decision. No such consequence as the disturbance or deprivation of any considerable property rights has been suggested as the result of returning to what I conceive to be the correct construction of the Constitution. The views of this Court upon the doctrine of *stare decisis* are fully set forth in *Hart* v. *Burnett* (15 Cal. 607). It cannot be contended that the conclusion to which I have arrived will be any violation of that doctrine, as there explained.

Judgment reversed and cause remanded, with direction to the court below to enter judgment for the defendants.

WALLACE, C. J., concurring specially:

An assessment, through whatever agency it is levied, is a tax, and it is, therefore, essential to its validity that it proceed upon some ascertained basis of uniformity. The assessment under consideration, as levied in the first instance, did not proceed upon such a basis. As originally levied, it omitted and exempted certain premises lying in the assessment district from the burden which it imposed upon the other premises in that district. As subsequently attempted to be validated by the act of March 30, 1874, this omission and exemption was still preserved and retained.

The "thing wanting," both before and after the passage of that act, was uniformity, and for this reason the assessment was not aided by the legislative act referred to.

Had the act been general and prospective, instead of special and retrospective—had it undertaken to provide for assessments of this character to be levied thereafter, not upon a prescribed basis of uniformity, an assessment levied in conformity therewith would have been void. It is not in the legislative authority to dispense with the required uniformity—whether by prospective acts providing for an assessment to be levied in the future, or retrospective acts seeking to impart validity to assessments already levied.

For these reasons I concur in the judgment, upon the ground first discussed by Mr. Justice McKINSTRY.

RHODES, J., also-concurring specially:

I concur in the judgment for the reasons expressed by the Chief Justice; but I am unable to concur with Mr. Justice McKINSTRY in the conclusions announced upon the second and third grounds discussed by him. Some of the propositions laid down by him might, perhaps, with propriety, have been accepted and applied at the commencement of the judicial history of the State as sound rules and maxims in the construction of our Constitution, and others,

perhaps, are deserving of a place in the instrument itself; but at an early day a different construction was adopted in respect to the power which the Legislature might exercise over municipal corporations, and in respect to persons and property within their territorial limits, until now many and valuable interests are held which had their origin in and are now dependent on such construction, and in my judgment that construction ought not to be changed except upon more cogent reasons than are presented in this case. I am not prepared at this time to enter upon a discussion of these important questions, but it is not improper to say that there are no reasons upon which it should be held that the power of the Legislature over the matters of "assessment" within municipal corporations are limited, that will not equally apply in respect to the power of the Legislature over the matters of borrowing money, contracting debts, or taxation for municipal purposes, mentioned in section thirty-seven, Article IV of the Constitution. The grounds upon which the authority is denied to the Legislature to direct a particular assessment within a municipal corporation to be levied, would also prohibit the Legislature from requiring that a particular debt should be contracted, by the municipality, or a particular tax levied for municipal purposes. If a change in these important provisions is necessary or desirable, it should, in my opinion, be made in the organic law itself, and not by means of a change in its construction.