**RHODE ISLAND COGENERATION AS- SOCIATES, A Delaware Limited Part- nership; Newbay Corporation and Oeig Limited Partnership, General Partners; and Newbay Corporation**

v.

**The CITY OF EAST PROVIDENCE; The City Council of the City of East Prov- idence; Leo C. Sullivan, Gerald R. Lynch, Paul J. Tavares, Joseph A. Bo- telho, Jr., and John J. Hurley, in their official capacities; and Alice Soares, Acting Treasurer, The City of East Providence.**

Civ. A. No. 89–0327P.

United States District Court, D. Rhode Island.

Jan. 4, 1990.

---

George E. Liberman, Robert A. Pitassi, Licht & Semonoff, Providence, R.I., for plaintiffs.

William J. Conley, Jr., City Sol., East Providence, R.I., Michael Rubin, Asst. Atty. Gen., Providence, R.I., for defendant-intervenor, R.I.

James Purcell, Steven Snow, Providence, R.I., for defendants.

## OPINION AND ORDER

PETTINE, Senior District Judge.

This action is brought by a corporation and a related limited partnership that plan to build a coal-fired cogeneration electrical facility in East Providence. Their efforts were stifled by the passage of an ordinance by the City Council of East Providence that bans the commercial use of coal anywhere in the City. The corporation and limited partnership are asking this Court to declare the ordinance void and to award damages for the costs the plaintiffs have incurred because of the delays in constructing and operating the facility caused by the passage of the ordinance and this ensuing lawsuit. The case is presently before the Court on two separate motions. In the first, the Attorney General of Rhode Island, James E. O'Neil, in his official capacity, seeks to intervene on the side of the defendants. In the second motion, the plaintiffs are asking for partial summary judgment on Counts I, II, and X of their Complaint.[1] In essence, this is a motion for complete summary judgment on the question of the validity of the City's Ordinance, as a finding of summary judgment for the plaintiffs on either Count I or Count II would void the Ordinance. Only the question of damages would remain.

For the reasons stated below, the motion of the Attorney General for intervention of

---

1. Count I asserts that the Ordinance enacted by defendants is ultra vires. Count II asserts that the state and federal governments through their environmental control laws have preempted the City's authority to enact the Ordinance. Count X asks the Court for a judgment declaring the Ordinance to be null and void.

right is granted. In the plaintiffs' motion for summary judgment, the critical question raised is whether the authority to enact this Ordinance has been preempted by state and federal environmental control laws. As I find that state law does preempt the Ordinance, the question is dispositive. That being so, the other issues raised in the plaintiffs' motion will not be addressed.

## I. FACTS

A short summary of the events leading to the institution of this suit will give context to the issues raised in these motions. The plaintiffs (Newbay) are the Newbay Corporation and Rhode Island Cogeneration Associates. The defendants (City) are the City of East Providence, the East Providence City Council, the members of the City Council in their capacity as City Council members, the Mayor of East Providence, and the Treasurer of East Providence. Newbay plans to build and operate a 72.5 megawatt coal-fired cogeneration electrical facility (the Facility) on Dexter Street in East Providence. The site chosen by Newbay for the Facility is zoned for heavy industrial use—a use which permits the construction of power plants. In 1987, Newbay obtained a variance from East Providence's zoning ordinance to permit the building of a stack that exceeded the height limitations in the zoning ordinance. The plaintiffs also obtained a special exception to store coal outside on the site of the Facility. Newbay is presently being evaluated by the Rhode Island's Department of Environmental Management, which licenses the operation of facilities like Newbay.

On May 15, 1989, the City Council passed a nuisance ordinance (Ordinance) entitled "Industrial Use of Coal." This Ordinance bans the industrial use of coal in East Providence.[2] Newbay is thus prohibited from operating its planned coal-fired cogeneration electrical facility in the City of East Providence.

On May 18, 1989, Newbay filed suit in the United States Federal District Court, District of Rhode Island. Newbay is asking for a declaratory judgment that the Ordinance is null, void and unconstitutional. The plaintiffs claim that the Ordinance 1) is ultra vires, 2) is preempted by state law, 3) is the result of an arbitrary exercise of power by the City, 4) denies Newbay equal protection of the laws, 5) denies Newbay its property without just compensation, 6) cannot be enforced against Newbay because Newbay reasonably relied upon representations of City officials that it could operate the Facility, 7) is a zoning ordinance disguised as a nuisance ordinance, and 8) is an improper interference with Newbay's contractual relationships. Newbay also seeks damages.[3]

## II. INTERVENTION BY ATTORNEY GENERAL

■ The Attorney General of Rhode Island seeks intervention of right under Fed. R.Civ.P. 24(a)(2).[4] As the chief legal officer of the state, the Attorney General has an interest in how the laws of the state are interpreted. Although the plaintiffs in this case are facially only challenging the validity of an ordinance of the City of East

---

2. City of East Providence, R.I., Revised Ordinances, Chapter 10, Article IV, section 10–54, provides: "Any industrial use of coal in the City of East Providence after the date this ordinance takes effect is hereby prohibited." The Ordinance took effect May 15, 1989.

3. Newbay claims that in reliance upon the welcome it received from the defendants and others, it incurred substantial costs in its preconstruction activities. These expenses include options on the real property at the site of the proposed Facility and an option on water to be used in the Facility's cooling process. Further, Newbay asserts that it has entered into several contracts that may either be cancelled or result

in substantial penalties because of the delay caused by this challenge to the Ordinance.

4. Fed.R.Civ.P. 24(a)(2) provides in pertinent part:

"Upon timely application anyone shall be permitted to intervene in an action: ... (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties."

Providence, the validity of that Ordinance may rest on the interpretation of state laws delegating powers to local governments and on the preemptive force of other state laws. The Attorney General's interest in this case is not simply in the interpretation of a single statute, but rather in the interpretation of the state's overall scheme of sharing or prohibiting governing powers with the cities and towns. The success of several of the plaintiffs' claims rests on how this Court interprets state laws delegating powers to cities and towns. This interest of the Attorney General is sufficient to satisfy the "interest" requirement of Fed.R.Civ.P. 24(a)(2). *See Nuesse v. Camp,* 385 F.2d 694 (D.C.Cir.1967) (state banking commission has interest in controversy involving Comptroller of Currency that concerns the nature and protection of state policy); *Smith v. Pangilinan,* 651 F.2d 1320 (9th Cir.1981) (U.S. Attorney General has protectable interest in action in which plaintiffs sought certificates of identity under laws of Northern Marianas as outcome could have effect on law regarding entitlement to U.S. citizenship).

It is perhaps a closer question whether the state's interest is adequately represented by the City of East Providence. According to 7C Wright and Miller, Federal Practice § 1909, at 319, if the interest of the intervenor "is similar to, but not identical with, that of one of the parties, a discriminating judgment is required on the circumstances of the particular case, but he ordinarily should be allowed to intervene unless it is clear that the party will provide adequate representation for the absentee." Here, the Attorney General seeks to represent the state's interests in local autonomy, an interest different from the City's interest in local autonomy.[5] This basic difference in concern for local autonomy is a sufficient indication that the state may not be adequately represented by the City of East Providence. *See Hines v. D'Artois,*

531 F.2d 726 (5th Cir.1976) (state examiner for fire and police civil service has right to intervene in employment discrimination suit against police department because employment practices intervenor required to administer were at stake in suit).

Therefore, as the Attorney General's motion for intervention was timely, and as an adverse ruling by this Court could hinder future attempts by the Attorney General to defend his position, the motion to intervene as of right is granted. The "Memorandum of Law" filed by Attorney General as a prospective Defendant–Intervenor in response to plaintiffs' motion for partial summary judgment will be considered in the Court's ruling on that motion.

## III. MOTION FOR PARTIAL SUMMARY JUDGMENT

### A. The Law of Summary Judgment

Newbay moves for summary judgment on the question of whether the Ordinance has been preempted by the state and federal environmental control laws. According to Fed.R.Civ.P. 56(c), summary judgment is appropriate when:

> [T]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

This Court "must view the facts in the light most favorable to the nonmoving party and indulge all inferences favorable to that party." *Borowiec, et al. v. Local No. 1570, etc., et al.,* 889 F.2d 23, 26 (1st Cir. 1989). However, the party opposing summary judgment may not defend its position with mere allegations, but "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). In this case it is important to note that the mere existence of *some* factual disputes

---

**5.** The state's interest in this controversy is that of one who grants power to subgroups. The state wants to assure itself that its grants of power (and perhaps that its restrictions on power) are not interfered with. The character of the state's organization of its authority is raised in this suit. The City's interest is more parochial. It primarily wants to enforce its Ordinance. The City wants the state's grants of power to be interpreted so that it has the authority to enact this Ordinance.

will not prevent summary judgment; the factual dispute must be material in that the dispute's determination in favor of the nonmoving party could lead a jury to find a verdict for the nonmoving party.

## B. Preemption by State Law

The parties have raised no issues of material fact that impede this Court from reaching the merits of the controversy of whether East Providence's Ordinance is preempted by the state and federal environmental control laws and is therefore void. Preemption itself always boils down to a question of legislative intent (here, the intent of both Congress and the Rhode Island Legislature): did the legislatures intend to preempt the ordinances of cities and towns when they passed the laws in question. If the legislatures did so intend, there is preemption. Legislative intent is a question of law. *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 299, 108 S.Ct. 1145, 1150, 99 L.Ed.2d 316 (1988); *California Federal Savings & Loan Ass'n v. Guerra*, 479 U.S. 272, 280, 107 S.Ct. 683, 689, 93 L.Ed.2d 613 (1987); *Securities Industry Association v. Connolly*, 883 F.2d 1114, 1117 (1st Cir.1989); *French v. Pan Am Express, Inc.*, 869 F.2d 1, 2 (1st Cir.1989). *See also Berberian v. Housing Authority of the City of Cranston*, 112 R.I. 771, 775, 315 A.2d 747, 749–50 (1974); *State v. Berberian*, 100 R.I. 274, 276, 214 A.2d 465, 466 (1965).

To determine whether the City's Ordinance has been preempted, two primary questions of intent need to be answered. The first question is whether R.I.Gen.Laws § 42–98–1 *et seq.* (Siting Act) affect the state's environmental laws as they apply to this case. If the Siting Act purposefully left to local governments the authority to enact laws like the Ordinance in question, no further investigation is required; the Ordinance could not be preempted by state law. If that question is answered in the negative, the question of whether the federal and/or state environmental control laws have preempted local ordinances like the one passed by East Providence must be addressed.

### 1. Authorization by Rhode Island's Siting Act

■ The Rhode Island Siting Act, per se, is not concerned with cogeneration electrical facilities of the size of the one planned by Newbay for East Providence. The Act regulates the siting, construction or alteration of facilities of a gross capacity of 80 megawatts or more. R.I.Gen.Laws § 42–98–3(A). However, it is necessary to examine the Siting Act because the defendants claim that the Act, through negative construction, makes the siting of facilities smaller than 80 megawatts to be solely a matter of local concern. If this interpretation is correct, local governments may control the siting and construction of smaller facilities without infringing upon the authority that may lie with the state under Rhode Island's environmental control laws.[6]

According to the legislative findings, the Siting Act was enacted because of the state's perceived future need for reliable sources of energy and its concern over the possible impact the decision to deny or permit these new sources of energy would have on the public health, safety, environment, and economy of Rhode Island. R.I. Gen.Laws § 42–98–1(A). The more specific findings of the legislature all deal with the problems of siting of major energy facilities.[7] The legislature stated that it was concerned with the fragmentation of the decisionmaking power involved in the siting of these major energy facilities, finding that, before passage of the Act, there was overlapping jurisdiction among several state agencies and that there was the po-

---

**6.** Whether a grant of authority to local governments to control the siting and construction of smaller cogeneration facilities would give the local governments authority to enact legislation like East Providence's Ordinance is a question this Court does not have to reach. The is irrelevant because of this Court's determination that the Siting Act is not a grant of authority to local governments.

**7.** A "major energy facility" is a facility "for the generation of electricity designed or capable of operating at a gross capacity of 80 megawatts or more." R.I.Gen.Laws § 42–98–3(A).

tential for conflicting decisions being issued by these agencies. To address these problems, the legislature set up the Siting Board as "the licensing and permitting authority for all licenses, permits, assents or variances which, under any statute of the state or ordinance of any political subdivision of the state, would be required for siting, construction or alteration of a major energy facility in the state of Rhode Island." R.I.Gen.Laws § 42–98–7(A)(1).

The statute removes the authority to issue permits, licenses, assents, or variances for siting, constructing or altering of major energy facilities from all other state and local authorities. The authority now rests exclusively with the Siting Board. The state and local authorities previously involved in these decisions are still to follow their procedures, but instead of issuing a permit, license, assent or variance, these authorities are to forward their findings and recommendations to the Siting Board. R.I.Gen.Laws § 42–98–7(A)(2). The Siting Act does not supersede the licensing authority that the Department of Environmental Management has under the delegated authority of federal laws.[8] R.I.Gen. Laws § 42–98–7(A)(3).

The Siting Act does not mention the regulation and licensing of the siting of facilities smaller than 80 megawatts, nor does it dismantle whatever authority other agencies (state or local) had before passage of the Siting Act. Although smaller facilities are exempted from the special "comprehensive" state legislation on siting, the legislation does not, by negative or positive construction, exempt smaller facilities from

the control of state laws and regulations that are no longer valid for major energy facilities. The Siting Act does not say that siting of these smaller facilities is exclusively a local concern; instead, it sustains the authority of "a variety of agencies within the government of the state and the political subdivisions thereof." R.I.Gen. Laws § 42–98–1(B).[9] The Siting Act is not a "bright line separating local and State purview." Memorandum of the Attorney General in Opposition to Newbay's Motion for Summary Judgment at 4. It separates the purview of the Siting Board from that of "[a]ny agency, board, council, or commission of the state or political subdivision of the state which, absent [the Siting Act], would be required to issue a permit, license, assent or variance" (R.I.Gen.Laws § 42–98–7(A)(2)) for siting, construction, or alteration of an energy facility.

The Siting Act, therefore, does not insulate the defendants from the plaintiffs' claim of preemption. The Act is neither a grant of power to local governments nor is it an abdication of power by the state. The Act leaves the status quo intact for the smaller energy facilities. The question now is whether, under that status quo, the state has preempted the City's authority to enact this particular Ordinance.[10] That status quo includes the Rhode Island air pollution control laws.

2. Preemption by State[11] Air Pollution Laws

■ Many years ago, the Rhode Island Supreme Court issued a clear statement on

---

**8.** This includes authority under the Federal Clean Water Act (33 U.S.C. § 1251 *et seq.*), the Clean Air Act (42 U.S.C. § 7401 *et seq.*), and those state laws and regulations that implement the federal laws.

**9.** This section of the statute was actually only discussing the authority for siting of *major* energy facilities that existed before passage of the Act. It can be assumed because there was no previous division of power based on the size of facilities that smaller facilities also were under the control of these same agencies.

**10.** For the purposes of this decision, the City's authority to enact the Ordinance, absent preemption, is assumed.

**11.** The federal statute itself and case law have made abundantly clear that the federal Clean Air Act, 42 U.S.C. § 7401 *et seq.*, does not prevent states or local governments from enacting standards more stringent than those contained in the federal laws and regulations. *See e.g.,* 42 U.S.C. § 7416; *Union Electric Co. v. Environmental Protection Agency,* 515 F.2d 206 (8th Cir.1975), *aff'd* 427 U.S. 246, 96 S.Ct. 2518, 49 L.Ed.2d 474 (1976). However, the congressional finding that state and local governments should have primary responsibility for controlling air pollution (42 U.S.C. § 7401(a)), is not a grant of power to local governments. Local governments are subordinate to the states; any grants of authority must come from the state legislatures, not from Congress. Thus, this

the supremacy of state laws over local ordinances.

> It is declared to be a fundamental principle that municipal ordinances are inferior in status and subordinate to the laws of the state. It is also recognized in this jurisdiction that an ordinance inconsistent with a state law of general character and state-wide application is invalid.

*Wood v. Peckham,* 80 R.I. 479, 482, 98 A.2d 669, 670 (1953) (citation omitted). *See also Berberian v. Housing Authority of City of Cranston,* 112 R.I. 771, 774–75, 315 A.2d 747, 749 (1974). Preemption by the state of local authority may be either express or implied. The plaintiffs do not claim, nor can they claim, that any relevant state law specifically prohibits local governments from passing enactments similar to the City's Ordinance. This leaves implied preemption.[12] Federal courts have developed theories or explanations to describe the various "kinds" of implied preemption,[13] but as the First Circuit recently said:

> The concept of implied preemption has a certain protean quality, which renders pigeonholing difficult. At bottom, the categories of which the cases speak are little more than analytic approaches which may be mixed and matched to meet the discernible needs of a particularized inquiry. Rather than embroiling ourselves in an unending search for meticulousness in labeling, and the diminishing returns which such a search necessarily entails, we prefer to take a more functional approach. In so doing, we abjure taxonomy for taxonomy's sake, and focus instead upon the effect which the challenged enactment will have on the federal plan.

Court does not need to examine the federal law for the purposes of this decision, and will concentrate on Rhode Island's laws and regulations governing air pollution. If the state has preempted East Providence's Ordinance, its validity cannot be saved by a grant of authority from Congress.

**12.** Rhode Island, unlike some states, recognizes implied preemption and does not require a clear statement by the legislature of intention to preempt. *See Wood v. Peckham,* 80 R.I. 479, 483, 98 A.2d 669, 670–71 (1953); *cf. Rollins*

*French v. Pan Am Express, Inc.,* 869 F.2d 1, 2 (1st Cir.1989). A similar approach will be taken here. The Ordinance will be declared invalid if East Providence's Ordinance inhibits the enforcement of the state's environmental laws, threatens to disrupt the state's overall scheme of regulation on environmental issues, or, instead of filling a gap in the state's regulatory scheme, provides a different regulatory scheme.

At first glance, Rhode Island's laws that seek to control the degradation of the state's environment appear to be an unending tangled web. Some of the original statutes dating back decades have been substantially amended numerous times, and the responsibilities enumerated in these laws have shifted from department to department. New departments and boards have been established; sometimes they simply replaced former departments; sometimes they are new boards established to deal with a particularized problem that comes under the auspices of one or more departments. New laws deal with specific problem areas that are also covered by the older, more general laws. Often the new laws do not state how they should be interpreted in relation to the more general laws that also cover the subject.

Apparently, as environmental awareness has grown and as the environmental problems have mushroomed, the legislature has sought to deal with these developments by engrafting amendments and departments onto the already existing structure for controlling environmental quality. Many of these changes have been forced by passage of federal legislation that mandates that the states either meet federal standards or have the federal government step in to

*Environmental Services, Inc. v. Township of Logan,* 199 N.J.Super. 70, 488 A.2d 258, 262 (1984).

**13.** These "kinds" of preemption include: 1. when there is actual conflict between the state and local laws; 2. when compliance with both state and local laws would be impossible; 3. where the state law implicitly erects a barrier to local regulation; and 4. where state law has entirely occupied that area of the law. *See Palmer v. Liggett Group, Inc.,* 825 F.2d 620 (1st Cir.1987).

establish and run the environmental controls for the state. The result in Rhode Island is the overlapping jurisdiction and potential for conflicting decisions mentioned in the Siting Act, R.I.Gen.Laws § 42–98–2(B), as well as uncertainty as to what the intent of the legislature in these areas is.

For the purposes of this decision, the web is untangled somewhat by examining only the state laws and regulations that deal with air pollution. The City's Answer to the plaintiffs' Complaint, as well as the Defendants' Memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment at 3, makes clear that the passage of the Ordinance was motivated by concern with the air pollution aspects of coal burning. Although other detrimental effects of having a coal-fired facility in East Providence may have been peripheral concerns, the "nuisance" the City sought to deal with was air pollution.[14] *See* Defendants' Memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment at 2–4.

In Rhode Island, the Department of Health and the Department of Environmental Management (DEM) are the agencies primarily responsible for establishing and enforcing air pollution standards. The general powers and duties of the director of DEM are outlined in R.I.Gen.Laws § 42–17.1–2. The powers and duties of the director of the Department of Health are contained in R.I.Gen.Laws § 23–1–1 *et seq.* These general statutes give the directors power to set minimum standards for air quality.[15] However, these minimum standards can be expanded and made more rigorous under the authority of a number of other statutes. Under the state's Clean Air Act, R.I.Gen.Laws § 23–23–1 *et seq.*, the director of DEM has the power and duty "[t]o develop comprehensive programs, for the prevention, control and abatement of new or existing pollution of the air resources of this state on the basis of air quality standards adopted by the environmental standards board," R.I.Gen. Laws § 23–23–5(2), and "[to] promulgate standards of air quality adopted by the environmental standards board." R.I.Gen. Laws § 23–23–5(4). The Environmental Standards Board[16] was set up to "establish standards of environmental quality ... and [ ] integrate and coordinate the activities of the departments of health and environmental management in those areas of environmental concern where the departments have joint or related responsibilities." R.I. Gen.Laws § 42–17.3–1. The Board was

---

**14.** The Attorney General of Rhode Island, as an intervenor-defendant, argues that the City's Ordinance is not an emissions control ordinance but a siting ordinance, and, therefore, is valid. Emissions, the Attorney General admits, are regulated by the state. Memorandum of the Attorney General in Opposition to Newbay's Motion for Summary Judgment at 12. The Attorney General is playing a sleight of hand game with words. To say that the Ordinance is not an attempt to regulate emissions simply because it entirely bans coal-fired power plants is nonsensical. The emission regulations of the state effectively ban certain industries and industrial practices, yet these are not considered siting regulations, they are emission regulations. The common sense reading of the Ordinance informs this Court that the City of East Providence was concerned with what the commercial enterprises burn—not with precisely where these businesses that burn coal are located. The City even states in its Answer to the Complaint that it does not prohibit Newbay from building an electrical cogeneration facility; it only prohibits Newbay from constructing such a facility that burns coal. This Court will not accept the Attorney General's invitation to convolute the

clear meaning of the Ordinance and turn an ordinance that on its face seeks to control what commercial businesses may burn into an ordinance that seeks to control where such businesses may locate. The dictate of the Rhode Island Supreme Court is that when an ordinance is clear and unambiguous, it must be interpreted literally. *See Mongony v. Bevilacqua,* 432 A.2d 661, 663 (R.I.1981).

**15.** The director of DEM has the power and duty "[t]o establish minimum standards for the establishment and maintenance of salutary environmental standards." R.I.Gen.Laws § 42–17.1–2(n). The director of the Department of Health has the power to provide rules and regulations relating to sanitation and health, and these rules and regulations may include "[m]inimum standards of air quality consistent with human health." R.I.Gen.Laws § 23–1–18(6).

**16.** The Environmental Standards Board consists of the directors of the Department of Administration, Department of Health, and DEM, or their designees. R.I.Gen.Laws § 42–17.3–1.

given the power and duty to adopt, modify, or repeal standards for air quality proposed by DEM under R.I.Gen.Laws § 23–23–1 *et seq.* The standards adopted by the Board "may exceed, but shall not be less than, minimum standards of air and water quality established by the department of health." [17] R.I.Gen.Laws § 42–17.3–2.[18]

Since 1967, the Department of Health and/or DEM have promulgated regulations dealing with various aspects of air pollution. Since 1972, these regulations have been evaluated by the federal government. At various times, amendments have been made to these regulations either to meet some special exigency or to comply with standards the federal government ruled the Rhode Island regulations failed to meet. The state has filed these amendments with the federal government, and each has been subject to federal scrutiny. *See* 40 C.F.R. § 52.2081.[19] Many of these regulations are very detailed and technical. They deal extensively with the problem that East Providence is seeking to eliminate: the pollution created by the commercial burning of coal.

*See* Rhode Island Department of Environmental Management, Air Pollution Control Regulations 3, 5, 7, 9, 13, and 22.

There can be no doubt that Rhode Island has a comprehensive plan to control air pollution in the state, and that Rhode Island's laws and regulations do seek to control the air pollution that results from the commercial burning of coal.[20] First, the director of DEM is mandated to develop a comprehensive program to prevent and control air pollution in Rhode Island. These programs must be based on air quality standards that cannot be less stringent than the already established standards that ensure "air quality consistent with human health." R.I.Gen.Laws § 23–1–18(6). This is a broad mandate for the state agencies, especially when combined with the declaration of policy that precedes the Rhode Island Clean Air Act:

It is hereby declared to be the public policy in the state of Rhode Island to preserve, protect, and improve the air resources of the state so as to promote the public health, welfare and safety,

**17.** The defendants' argument that *Gara Realty Inc. v. Zoning Board of Review of Town of Gloucester,* 523 A.2d 855 (R.I.1987), controls this case is based on an examination of only one section of one of Rhode Islands' environmental control laws—that which says DEM sets minimum standards for the establishment of salutary environmental conditions. R.I.Gen.Laws § 42–17.1–2(n). At first glance, this minimum standards section would place this case squarely within the parameters of *Gara Realty,* in which the Rhode Island Supreme Court declared that a minimum standards provision left to local governments the prerogative to create more restrictive requirements. But unlike the *Gara Realty* situation that dealt with the location of sewage disposal systems, the mandate to DEM to establish minimum standards for salutary environmental conditions is not the final state word on DEM's and other state agencies' role in controlling air pollution. As demonstrated above, the state has established a program that goes well beyond enforcing only minimum standards—and it is this program that must be evaluated for its preemptive force.

**18.** R.I.Gen.Laws § 42–17.3–2 cites the Department of Health's power to set minimum standards for air and water quality under "subdivisions 18(7), (8) and (9) of chapter 1 of title 23." However, there is no subdivision 18(9) of this chapter. The Rhode Island Legislature certainly meant subdivisions 18(6)–(8). 18(6) deals

with air quality; 18(7) and 18(8) deal with water quality.

**19.** As of 1988, the Rhode Island State Implementation Plan (the plan submitted to the federal government to bring Rhode Island into compliance with the federal Clean Air Act) contained 20 regulations dealing with various aspects of air pollution: 1) Visible emissions; 2) Handfiring of soft coal; 3) Particulate emissions from industrial processes; 4) Open fires; 5) Fugitive dust; 6) Opacity monitors; 7) Emission of air contaminates detrimental to persons or property; 8) Sulfur content of fuels; 9) Approval to construct modify or operate; 10) Air pollution episodes; 11) Petroleum liquids marketing and storage; 12) Incinerators; 13) Particulate emissions from fossil fuel fired steam or hot water generating units; 14) Record keeping and reporting; 15) Control of organic solvent emissions; 16) Operation of air pollution control system; 17) Odors; 18) Control of emissions from solvent metal cleaning; 19) Control of VOCs from surface coating operations; [no regulation 20 is listed] 21) Control of VOCs from printing operations. Regulation 22, entitled "Air Toxics," was added in 1988.

**20.** Since early 1988, Newbay has been involved in various permitting proceedings before DEM. Statement of Undisputed and Disputed Facts in Connection with Plaintiffs' Motion for Partial Summary Judgment, Undisputed Fact # 5.

prevent injury or detriment to human, plant and animal life, physical property and other resources and to foster the comfort and convenience of the state's inhabitants.

R.I.Gen.Laws § 23–23–2. The mandate to the state agencies has been carried out through detailed laws and regulations that establish standards, require permits for polluting enterprises, monitor emissions, and set up enforcement and punitive mechanisms for those who are not in compliance with the state requirements.[21]

Further, the Rhode Island State Implementation Plan seeks to meet all the criteria set forth for states in the federal Clean Air Act, 42 U.S.C. § 7410 ("State Implementation Plans for National and Secondary Ambient Air Quality Standards") and in the regulations that implement that statute.[22] The Providence area of Rhode Island, which includes East Providence, is considered by the federal government to be a nonattainment area.[23] Because of this, the area is subject to additional oversight by the agencies charged with controlling air pollution, and plans must be made to provide for annual incremental reductions in the relevant pollutant so that the national standards can be met by a date specified by the federal government.[24] 42 U.S.C. § 7502.

These state agencies established to carry out the state's air pollution laws and regulations are surely as aware as the City Council of East Providence of the potential air pollution hazards created by a coal-burning facility. The state regulations dealing exclusively with coal burning and others dealing with air pollution more generally show conclusively that the state is attempting to deal with the problems created by coal burning. Although there is authority that this overlapping of regulation is sufficient for a finding of preemption, this Court is reluctant, without further evidence of intention to preempt, to nullify the broad powers granted to municipalities to protect the health, safety and welfare of their inhabitants.[25] But there is more.

Language throughout the state Clean Air Act and the regulations implementing that Act reveals an intention by the Rhode Island Legislature that their scheme to control air pollution be all encompassing. The legislation does not leave gaps to be filled by local governments. It anticipates individualized decisions on all sources of air pollution, decisions that will take into account local, regional, and statewide concerns.

The state Clean Air Act authorizes the director of DEM "[t]o advise, consult and cooperate with the cities and towns ... in furthering the purposes of this chapter" (R.I.Gen.Laws § 23–23–5(3)); to consider "population density, air pollution levels, the

---

21. Special regulations apply to those intending to construct a "major stationary source," under which definition Newbay's planned Facility falls. These regulations include requirements that these new facilities use the "best available control technology" (BACT). Even when a facility uses this BACT, the emissions from that facility cannot exceed emission rates contained in any other air pollution control regulation. Rhode Island Department of Environmental Management, Air Pollution Control Regulation No. 9, "Approval To Construct, Install, Modify or Operate."

22. Rhode Island's Clean Air Act authorizes the Department of Health "to take all action necessary or appropriate to secure to this state the benefit of [the federal air pollution] laws, acts or programs." R.I.Gen.Laws § 23–23–4(b).

23. A nonattainment area is an area in which a national ambient air quality standard is exceeded for any pollutant. 42 U.S.C. § 7501(2).

24. The plans for these nonattainment areas must include an inventory of all emissions of air pollutants from all sources, and an identification and quantification of any such pollutant which will result from the construction or operation of any new source of air pollution. 42 U.S.C. § 7502(b)(4) and (5).

25. *Wood v. Peckham*, 80 R.I. 479, 98 A.2d 669 (1953), establishes that "the same precise matters [as the state has specifically regulated] should not be regulated by a municipality, unless it was given an express grant of power." *Id.*, 80 R.I. at 483. As shown above, the City Ordinance and the state laws and regulations on air pollution both seek to control emissions that are the result of coal burning. However, the sensitivity of this question and the great local interest that is clearly present compel this Court to go one step further than the requirements of *Wood* to show preemption.

character and degree of injury to health or physical property" when issuing orders prohibiting or abating air pollution (R.I. Gen.Laws § 23–23–5(8)); to make rules and regulations for the control of air pollution, but "[s]uch rules and regulations for the control of pollution need not be uniform throughout the state. Variations thereof may be based on considerations of population density, meteorological conditions, contaminant emissions, air quality, land development plans, and such other factors which may be relevant to the protection of the air resources of the state." R.I.Gen.Laws § 23–23–5(12). Further, the director of DEM is given broad powers to investigate and issue orders "[i]f any person is causing air pollution."[26] R.I.Gen.Laws § 23–23–8(a).

These statutory provisions show clearly that the legislature intended that local considerations be taken into account when making decisions on pollution control. The legislature has mandated that the state agencies consider the same local circumstances that East Providence took into consideration when it passed the Ordinance.[27] The legislature certainly did not intend that local governments also consider these factors and make their own determinations—determinations that could nullify decisions made or to be made by the state.[28]

Further, another section of the state Clean Air Act, entitled "Regulation of Burning in Open Fires," R.I.Gen.Laws § 23–23–18, by implication shows that the Rhode Island Legislature intended to preempt the authority of cities and towns to regulate most kinds of air pollution. In that section, the legislature grants to the director of DEM the authority to prohibit open burning in public refuse disposal facilities and at salvage, commercial, industrial or institutional operations. However, the section goes on specifically to say that nothing in the Clean Air Act is to interfere with the authority of cities and towns to adopt ordinances to prohibit open burning, except as is specifically described as being granted to the state. If the Legislature did not intend to preempt the authority of the cities and towns in other aspects of air pollution control, why did the Legislature go out of its way to say that this particular authority was not preempted?

Finally, an analysis of the Ordinance itself provides persuasive evidence of preemption. It is extremely significant that the Ordinance places a total ban on commercial coal burning. The City does not limit its restriction to especially sensitive areas of the City; it does not limit the restriction to times, conditions, or size. However, the state of Rhode Island licenses facilities like the one planned by Newbay. For the City of East Providence to declare the commercial burning of coal to be a nuisance per se, is to nullify the

---

**26.** "Air pollution" itself is given a broad definition: "presence in the outdoor atmosphere of one or more air contaminants in sufficient quantities, which either alone or in connection with other emissions, by reason of their concentration and duration may be injurious to human, plant or animal life or cause damage to property or which unreasonably interfere with the enjoyment of life and property." R.I.Gen. Laws § 23–23–3(1). Thus, the director is given the authority to investigate pollution problems that may not be covered by the regulations adopted to implement the state's Clean Air Act.

**27.** In enacting its regulations to carry out the mandates of the Rhode Island air pollution laws, the state recognized that its regulations and laws might not cover every kind and occurrence of air pollution, and thus it promulgated a catch-all regulation. It did not leave these unconsidered or unknown situations to be dealt with by the cities and towns. Instead, DEM promulgated Air Pollution Control Regulation

No. 7: "No person shall emit any contaminant which either alone or in connection with other emissions, by reason of their concentration or duration, may be injurious to human, plant or animal life, or cause damage to property or which unreasonably interferes with the enjoyment of life and property."

**28.** The City's Ordinance would also subvert the authority of the director of DEM to issue variances under the state's Clean Air Act. R.I.Gen. Laws § 23–23–15 grants the director the power to suspend enforcement of any provisions of the Act if a person can show that the provision(s) cause undue hardship without a corresponding benefit and if the variance is consistent with the federal Clean Air Act and will not cause air pollution that creates a danger to public health or safety. The City's Ordinance prevents the director from effectively issuing a variance to any coal-burning commercial enterprise in East Providence.

state's licensing procedure. The City argues that the state has a policy against the use of coal in facilities like the one planned by Newbay, and it cites a statement by the state's Energy Coordinating Council.[29] This statement only weighs against the position of the City. The statement shows that the state is aware of the very serious pollution problems created by coal-fired electric generating facilities, problems that are global not local. But the state still licenses or may license facilities like the one planned by Newbay. If there is a state policy against coal burning, it will be reflected in the licensing of facilities like the one planned by Newbay.

The City of East Providence has invaded Rhode Island's ability to issue licenses; the City may not do that. The Supreme Court of Rhode Island expressed this prohibition eloquently almost one hundred years ago when it considered the power of the state to appoint a city police chief in the place of the police chief elected by the city council. The Supreme Court said:

> In any system of government, towns, as well as individuals, must yield something of individual independence for the public good. The most important laws are made by the legislature, and agencies are created to enforce them. Ordinarily the State makes use of existing agencies, like town or city officers, to do this, but none the less are they officers of the State. To say, therefore, that the State cannot assume control of these agencies in public affairs, is to say that a town can nullify a State law, which it does not approve....

*City of Newport v. Horton*, 22 R.I. 196, 208, 47 A. 312 (1900). To uphold the City of East Providence's Ordinance would be to say that the state may not license Newbay's planned facility to do business in East Providence.

**29.** The statement, entitled "Options for Electric Generation:
  Economic and Environmental Implications," included the following:
  > Great concern has been expressed by the public, environmentalists, and segments of the scientific and medical communities relative to the impacts of coal-fired electric generation

## IV. CONCLUSION

Accordingly, because the state of Rhode Island has adequately evinced its intention to occupy the field of air pollution control and because the East Providence Ordinance may seriously inhibit the regulatory scheme developed by the state, the City of East Providence, R.I., Revised Ordinances, Chapter 10, Article IV, section 10–54, is hereby declared null and void. The future of Newbay's planned Facility must be determined under the environmental laws and regulations of the state of Rhode Island. Plaintiffs' motion for summary judgment is granted.

on air quality, acid rain deposition, global warming and the overall environment. It is clear that on emissions grounds alone, coal facilities have a significant hurdle to overcome depending on how emissions factors are weighed in siting considerations.
Objection to Plaintiffs' Motion for Partial Summary Judgment at 25n–26n.